**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

GINA KNAUSS,

              Plaintiff,

    v.

BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.; SANOFI-
AVENTIS U.S. LLC; SANOFI US SERVICES
INC.; CHATTEM, INC.; PATHEON
MANUFACTURING SERVICES LLC,

              Defendants.

Case No.: 2:26-cv-04087

DEMAND FOR JURY TRIAL

## **COMPLAINT**

Plaintiff files this Personal Injury Complaint against Defendants identified below. Plaintiff brings this Complaint because Decedent, Ann Bailey, developed cancer from taking medication that Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold.

For decades, Defendants widely promoted and/or sold Zantac and/or its generic equivalent ranitidine as being safe and effective for use to combat heartburn symptoms, making it the first pharmaceutical drug to reach $1 billion in sales. But Defendants concealed from the public a devastating secret. The secret: Zantac transforms over time and under certain conditions into a well-known cancer-causing compound, N-Nitrosodimethylamine (NDMA). When that secret was revealed in 2019, manufacturers and retailers quickly withdrew their product from the market and, in 2020, the U.S. Food and Drug Administration ultimately directed removal of all ranitidine-containing products from shelves nationwide. Now, Plaintiff seeks to hold Defendants accountable for causing hundreds of thousands of people to develop cancer.

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ............................................................................................... i

INTRODUCTION............................................................................................................ 1

PARTIES ......................................................................................................................... 4

    Plaintiff............................................................................................................... 4

    Defendants.......................................................................................................... 4

JURISDICTION & VENUE ........................................................................................... 6

FACTUAL ALLEGATIONS........................................................................................... 7

    I.    THE CREATION OF RANITIDINE-CONTAINING PRODUCTS AND THEIR INTRODUCTION TO THE MARKET .................................................. 7

        A.    GSK Develops Zantac Through a Flurry of Aggressive Marketing Maneuvers 7

    II.    NDMA IS A CARCINOGEN WHOSE DANGEROUS PROPERTIES ARE WELL ESTABLISHED ...................................................................................... 12

    III.    NDMA IS DISCOVERED IN RANITIDINE-CONTAINING PRODUCTS, LEADING TO MARKET WITHDRAWAL ............................................. 23

    IV.    HOW RANITIDINE TRANSFORMS INTO NDMA ............................................... 27

        Figure 1 – Diagram of Ranitidine & NDMA Molecules ................................. 27

        A.    Formation of NDMA in the Environment of the Human Stomach.................. 28

        Table 1 – Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol............................................................................................... 36

        Table 2 – Valisure Biologically Relevant Tests for NDMA Formation .......... 38

        B.    Formation of NDMA in Other Organs of the Human Body ........................... 39

        Figure 2 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme ......................................................................................... 40

        Figure 3 – Expression levels of DDAH-1 enzyme by Organ .......................... 41

        C.    Formation of NDMA by Exposure to Heat, Moisture, and/or Time................ 42

        Figure 4 – Rate of Development of NDMA when Exposed to Heat ............... 43

    V.    EVIDENCE DIRECTLY LINKS RANITIDINE EXPOSURE TO CANCER ........ 45

    VI.    DEFENDANTS KNEW OR SHOULD HAVE KNOWN OF THE NDMA RISK.. 47

    VII.    DEFENDANTS MADE FALSE STATEMENTS IN THE LABELING OF RANITIDINE-CONTAINING PRODUCTS ............................................................ 49

    VIII.    FEDERAL LAW REQUIRED THE DEFENDANTS TO NOTIFY THE FDA ABOUT THE PRESENCE OF NDMA IN RANITIDINE-CONTAINING PRODUCTS ..................................................................................... 53

IX.    GOOD MANUFACTURING PRACTICES ............................................................... 55

X.    Decedent's USE OF RANITIDINE-CONTAINING PRODUCTS .......................... 56

**TOLLING / FRAUDULENT CONCEALMENT** ....................................................... **58**

**EXEMPLARY / PUNITIVE DAMAGES ALLEGATIONS** .................................. **59**

**CAUSES OF ACTION** .............................................................................................. **60**

Count I:  Strict Products Liability—Failure to Warn Through Warnings and Precautions  60

Count II:  Negligence—Failure to Warn Through Warnings and Precautions ................... 68

Count III:  Strict Products Liability—Failure to Warn Through Proper Expiration Dates . 75

Count IV:  Negligence—Failure to Warn Through Proper Expiration Dates ..................... 80

Count V:  Failure to Warn the Consumers Through the FDA ........................................... 85

Count VI:  Strict Products Liability—Design Defect Due to Warnings and Precautions... 91

Count VII:  Strict Products Liability—Design Defect Due to Improper Expiration Dates  98

Count VIII:  Negligent Failure to Test ............................................................................. 103

Count IX:  Negligent Product Containers ......................................................................... 107

Count X:  Negligent storage and transportation ............................................................... 110

Count XI:  Unjust Enrichment .......................................................................................... 114

Count XII:  Survival Actions ............................................................................................ 116

Count XIII:  Wrongful Death ............................................................................................ 118

**JURY TRIAL DEMAND** ........................................................................................ **119**

**PRAYER FOR RELIEF** ........................................................................................... **119**

**INTRODUCTION**

1.      Zantac is the branded name for ranitidine, a "blockbuster" drug that was sold as a safe and effective antacid.  But ranitidine transforms over time and under particular conditions into high levels of NDMA, a carcinogen that is as potent as it is dangerous.  After almost four decades and billions of dollars of sales, ranitidine consumption has caused scores of consumers to develop cancer.  Plaintiff brings this action because of Defendants' design, testing, marketing, labeling, packaging, handling, distribution, storage and sale of brand-name and generic ranitidine-containing products.

2.      Until its recent recall by the FDA, ranitidine was a popular heartburn drug consumed by millions of people every day.  Recent scientific studies, however, confirm what drug companies knew or should have known decades earlier: ingesting ranitidine exposes the consumer to unsafe and excessive amounts of NDMA.

3.       NDMA is a well-known potent carcinogen.  It was first discovered in the early 1900s as a byproduct of manufacturing rocket fuel.  Today, its only use is to induce cancerous tumors in animals as part of laboratory experiments.  Its only function is to cause cancer.  It has no medicinal purpose whatsoever.

4.      NDMA is not akin to other compounds that have a salutary effect at low levels and a negative effect with greater exposure.  There is no recommended daily dose of NDMA.  The ideal level of exposure is zero.  Nonetheless, the FDA previously set an allowable daily limit of NDMA of 96 nanograms (ng) to minimize the risks posed by this dangerous molecule. Yet a single pill of ranitidine can contain quantities of NDMA that are hundreds, if not thousands, of times higher than the allowable limit.

5.      Those recent revelations by the scientific community have caused widespread

1

recalls of ranitidine both domestically and internationally. In fact, after numerous voluntary recalls, on April 1, 2020, the FDA ordered the immediate withdrawal of all ranitidine-containing products sold in the United States, citing unacceptable levels of NDMA accumulation.

6. The high levels of NDMA observed in ranitidine-containing products are a function of various factors. The ranitidine molecule internally degrades to form NDMA. The degradation of ranitidine into NDMA can increase over time under normal storage conditions, but more so with exposure to heat and/or humidity. Once in the body, ranitidine continues to degrade and can yield increasing levels of NDMA in the human digestive system.

7. In the aggregate, ranitidine-containing products were akin to billions of Trojan horses that smuggled dangerously high levels of NDMA into the bodies of millions of consumers where it then produced more NDMA once in the body.

8. Zantac wreaked such widespread harm in large part because Glaxo—the inventor of ranitidine—succumbed to a temptation that is all too familiar to pharmaceutical innovators: maximizing the profits of an incredibly lucrative, government-conferred monopoly.

9. To encourage pharmaceutical companies to invest in research and development, the U.S. legal and regulatory system offers drug companies who invent "new chemical entities" two powerful inducements. First, innovators obtain patent protection for their pharmaceutical compounds. Second, approved new drugs enjoy FDA exclusivity, irrespective of whether the molecule is protected by one or more issued patents. Taken together, these policies assure that a pharmaceutical innovator will receive the exclusive right, for a limited period of time, to sell its drug to the American public.

10. The argument for monopoly pharmaceutical franchises rests on the profit-motive. R&D is time consuming and expensive, and not all drug-development efforts will

succeed. Once a drug is approved, some period of monopoly profits is necessary to allow innovators to recoup their sunk R&D costs in both successful and unsuccessful pursuits. A costly pursuit of a new potential blockbuster that ultimately fails can be financially devastating for smaller pharmaceutical companies.

11.    In some ways, the system works as intended. Pharmaceutical companies do invent new and useful medicines that—absent high profit potential—might not otherwise come to market. But once an innovator possesses a blockbuster monopoly franchise, it has a virtual license to mint money. Most pharmaceutical ingredients are cheap commodities, which brand-name manufacturers then resell at a monopoly markup. During the exclusivity period, brand-name drugs routinely enjoy gross profit margins of 70, 80, or even 90+ percent. No other industry comes close to matching this profit-generating potential.

12.    As a result of these economic realities, branded drug manufacturers have a strong—and too often perverse—incentive to sell as much product as they can during their exclusivity window. That is why brand-name manufacturers spend billions of dollars per year in sales and marketing efforts to push incremental sales of a brand-name drug. Where every $1 in new sales can produce upwards of $.90 in gross profit, staggering sales and marketing budgets are a very profitable investment. But while it makes sense for brand-name manufacturers to spend vast sums of money to develop and promote FDA approved drugs, they have no equivalent economic or regulatory incentive to uncover and investigate developing risks posed by their products.

13.    That problem is especially acute for bestselling, blockbuster drugs. And Zantac is the brand that gave meaning to a blockbuster pharmaceutical product, becoming the first drug ever to generate over $1 billion in annual sales. Zantac's success catapulted Glaxo ahead of its previously larger rivals, fueling the market capitalization and corporate combinations that gave the

3

company its current name: GlaxoSmithKline. It is little wonder Glaxo spared no expense to both get Zantac to market and to aggressively promote it to millions of consumers. Yet Glaxo did not part with a comparative pittance to investigate the obvious cancer risk posed by ranitidine. Turning a blind eye was far more profitable.

14. Ultimately, the law holds every corporate entity in the supply chain of ranitidine responsible for the personal injuries and death caused by such an unsafe product. And the civil justice system is the first, last, and only line of defense against the unchecked avarice that is a byproduct of a regulatory regime with the well-intentioned aim of bringing safe and effective medicines to market. Plaintiff seeks redress both to compensate her for the horrific losses she suffered in the past and to strongly deter future misconduct.

## PARTIES

### PLAINTIFF

15. This Complaint is filed on behalf of Plaintiff, Decedent, and, if applicable, Decedent's spouse, children, parents, heirs, estate, wards, guardians or other legally appointed representatives.

16. Plaintiff in this individual action is a citizen of Cotopaxi, Colorado, whose deceased sister has suffered personal injuries and death as a result of using Defendants' dangerously defective ranitidine-containing products.

17. Decedent consumed Zantac starting in approximately 1983 until approximately 2024.

18. Decedent was diagnosed with colorectal cancer and her sequelae, which was directly and proximately caused by her use of ranitidine-containing products.

### DEFENDANTS

19. Defendants are entities that designed, manufactured, marketed, distributed, labeled,

4

packaged, handled, stored, and/or sold ranitidine.

**Boehringer Ingelheim (BI)**[1]

20.    Defendant Boehringer Ingelheim Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877. Defendant Boehringer Ingelheim Pharmaceuticals, Inc., is a citizen of Delaware and Connecticut.

21.    Defendant Boehringer Ingelheim Pharmaceuticals, Inc. (BIPI, BI, or Boehringer Ingelheim) is a subsidiary of Boehringer Ingelheim Corporation, which is wholly owned by Boehringer Ingelheim International GmbH.

**Sanofi**

22.    Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability company with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807. Defendant Sanofi-Aventis U.S. LLC's sole member is Defendant Sanofi U.S. Services, Inc., a Delaware corporation with its principal place of business in New Jersey.  Defendant Sanofi-Aventis U.S. LLC is a citizen of Delaware and New Jersey.

23.    Defendant Sanofi US Services Inc. is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807.  Defendant Sanofi US Services Inc. is a citizen of Delaware and New Jersey.

24.    Sanofi SA is a corporation formed and existing under the laws of France, having a principal place of business at 54 Rue La Boetie, 8th Arrondissement, Paris, France 75008.  Sanofi SA is a citizen of France.

---

[1] Defendant Boehringer Ingelheim also manufactured generic ranitidine under ANDA 074662, as well as through its former subsidiary Ben Venue Laboratories Inc. d/b/a Bedford Laboratories (ANDA 074764).  Ben Venue Laboratories Inc. is no longer in operation.

25.     Defendant Patheon Manufacturing Services LLC is a Delaware limited liability company with its principal place of business located at 5900 Martin Luther King Jr. Hwy, Greenville, North Carolina 27834.  Thermo Fisher Scientific, Inc. is the sole member of Defendant Patheon Manufacturing Services LLC.  Thermo Fisher Scientific, Inc. is a Delaware corporation with its principal place of business in Massachusetts.  Defendant Patheon Manufacturing Services LLC is a citizen of Delaware and Massachusetts.

26.     Defendant Chattem, Inc. is a Tennessee corporation with its principal place of business located at 1715 West 38th Street Chattanooga, Tennessee 37409.  Defendant Chattem is a citizen of Tennessee.  Defendant Chattem is a wholly owned subsidiary of Sanofi SA.

27.     Defendant Chattem purchased ranitidine and repackaged and/or relabeled it under its own brand.

28.     Defendants Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. are subsidiaries of Sanofi SA. Patheon Manufacturing Services LLC and Boehringer Ingelheim Promeco, S.A. de C.V. packaged and manufactured the finished Zantac product for Sanofi.  Collectively, these entities shall be referred to as Sanofi.

*     *     *

29.     Defendants BI and Sanofi shall be referred to collectively as the Defendants.

**JURISDICTION & VENUE**

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  There is complete diversity among Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

31.     All Defendants are registered to do business in the Commonwealth of Pennsylvania.

6

32.    Defendants have consented to personal jurisdiction in Pennsylvania by registering to do business in the Commonwealth. *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir. 1987) ("A federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." (citation omitted)); *see generally Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023) (registering to do business in Pennsylvania is valid consent to personal jurisdiction in the Commonwealth).

33.    All Defendants reside in this district because of their consent to personal jurisdiction.  28 U.S.C. § 1391(c)(2).

34.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

### I. THE CREATION OF RANITIDINE-CONTAINING PRODUCTS AND THEIR INTRODUCTION TO THE MARKET

35.    Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine under the brand name Zantac by either prescription or over the counter.  Defendants sold or otherwise made available ranitidine in the following forms: injection, syrup, granules, tablets and/or capsules.

### A. GSK Develops Zantac Through a Flurry of Aggressive Marketing Maneuvers

36.    Ranitidine belongs to a class of medications called histamine $H_2$-receptor antagonists (or $H_2$ blockers), which decrease the amount of acid produced by cells in the lining of the stomach.  Other drugs within this class include cimetidine (branded Tagamet), famotidine (Pepcid), and nizatidine (Axid).

37.    GSK-predecessor Smith, Kline & French discovered and developed Tagamet, the first $H_2$ blocker and the prototypical histamine $H_2$ receptor antagonist from which the later

7

members of the class were developed.

38.    GSK[2] developed Zantac specifically in response to the success of cimetidine. Recognizing the extraordinary potential of having its own H$_2$ blocker in the burgeoning anti-ulcer market, GSK was all too willing to ensure its drug succeeded at all costs.

39.    In 1976, scientist John Bradshaw, on behalf of GSK-predecessor Allen & Hanburys Ltd. synthesized and discovered ranitidine.

40.    Allen & Hanburys Ltd., a then-subsidiary of Glaxo Laboratories Ltd., is credited with developing ranitidine and was awarded Patent No. 4,128,658 by the U.S. Patent and Trademark Office in December 1978, which covered the ranitidine molecule.

41.    In 1983, the FDA granted approval to Glaxo to sell Zantac, pursuant to the New Drug Application (NDA) No. 18-703, and it quickly became GSK's most successful product—a "blockbuster."  Indeed, Zantac became the first prescription drug in history to reach $1 billion in sales.

42.    To accomplish this feat, GSK entered into a joint promotion agreement with Hoffmann-LaRoche, Inc., increasing Zantac's U.S. sales force from 400 people to approximately 1,100.[3]  More salespersons drove more sales and blockbuster profits for GSK.

43.    In June 1986, the FDA approved Zantac for maintenance therapy of duodenal ulcers and for treatment of patients with gastroesophageal reflux disease (GERD).

---

[2] GSK, as it's known today, was created through a series of mergers and acquisitions:  In 1989, Smith, Kline & French merged with the Beecham Group to form SmithKline Beecham plc.  In 1995, Glaxo merged with the Wellcome Foundation to become Glaxo Wellcome plc.  In 2000, Glaxo Wellcome plc merged with SmithKline Beecham plc to form GlaxoSmithKline plc and GlaxoSmithKline LLC.

[3]  GSKZAN0000348881; GSKZAN0000348871. Bates number citations are to documents produced during discovery in MDL No. 2924, pending in the Southern District of Florida. Nothing confidential is being disclosed in this complaint because all information has been publicly filed on the MDL docket and in the Eleventh Circuit.

44.     In December 1993, GSK (through Glaxo Wellcome plc) entered into a partnership agreement with Pfizer-predecessor company Warner-Lambert Co. to develop and market an OTC version of Zantac.[4]  In 1995, the FDA approved OTC Zantac 75 mg tablets through NDA 20-520. In 1998, the FDA approved OTC Zantac 75 mg effervescent tablets through NDA 20-745.

45.     In 1998, GSK (Glaxo Wellcome plc) and Warner-Lambert Co. ended their partnership.  As part of the separation, Warner-Lambert Co. retained control over the OTC NDA for Zantac and the Zantac trademark in the United States and Canada but was required to obtain approval from GSK before making any product or trademark improvements or changes.  GSK retained rights to sell OTC Zantac outside of the United States and Canada,[5] and retained control over the Zantac trademark internationally.[6]

46.     In 2000, Pfizer acquired Warner-Lambert Co.  Pfizer controlled the Zantac OTC NDAs until December 2006.

47.     In October 2000, GSK sold to Pfizer the full rights to OTC Zantac in the United States and Canada pursuant to a divestiture and transfer agreement.  As part of that agreement, GSK divested all domestic Zantac OTC assets to Pfizer, including all trademark rights.  The agreement removed the restrictions on Pfizer's ability to seek product line extensions or the approval for higher doses of OTC Zantac.  GSK retained the right to exclusive use of the Zantac name for any prescription ranitidine-containing product in the United States.

48.     In October 2003, Pfizer submitted NDA 21-698 for approval to market OTC Zantac 150 mg.  The FDA approved NDA 21-698 on August 31, 2004.

49.     During the time that Pfizer owned the rights to OTC Zantac, GSK continued to

---

[4] GSKZAN0000022775.
[5] GSK also still held the right to sell prescription Zantac in the United States.
[6] PFI00245109.

manufacture the product.

50.     In 2006, pursuant to a Stock and Asset Purchase Agreement, Pfizer sold and divested its entire consumer health division (including employees and documents) to Johnson & Johnson.[7]  Because of antitrust issues, however, Zantac was transferred to Boehringer Ingelheim.

51.     Pfizer, through a divestiture agreement, transferred all assets pertaining to its Zantac OTC line of products, including the rights to sell and market all formulations of OTC Zantac in the United States and Canada, as well as all intellectual property, R&D, and customer and supply contracts to Boehringer Ingelheim.  As part of that deal, Boehringer Ingelheim obtained control and responsibility over all of the Zantac OTC NDAs.

52.     GSK continued marketing prescription Zantac in the United States until 2017 and still holds the NDAs for several prescription formulations of Zantac.  GSK continued to maintain manufacturing and supply agreements relating to various formulations of both prescription and OTC Zantac.  According to its recent annual report, GSK claims to have "discontinued making and selling prescription Zantac tablets in 2017 . . . in the U.S."[8]

53.     Boehringer Ingelheim owned and controlled the NDA for OTC Zantac between December 2006 and January 2017, and manufactured, marketed, and distributed the drug in the United States during that period.[9]

54.     In 2017, Boehringer Ingelheim sold the rights of OTC Zantac to Sanofi under an asset swap agreement.  As part of that deal, Sanofi obtained control and responsibility over Boehringer Ingelheim's entire consumer healthcare business, including the OTC Zantac NDAs.

---

[7] PFI00191352.

[8] GlaxoSmithKline, plc, *Annual Report* 37 (2019), https://www.gsk.com/media/5894/annual-report.pdf.

[9] Boehringer Ingelheim also owned and controlled ANDA 074662.

As part of this agreement, Boehringer Ingelheim and Sanofi entered into a manufacturing agreement where Boehringer continued to manufacture OTC Zantac for Sanofi.

55.     Sanofi has controlled the OTC Zantac NDAs and marketed, sold, and distributed Zantac in the United States from January 2017 until 2019 when it issued a global recall and ceased marketing, selling, and distributing OTC Zantac.  In addition, Sanofi has marketed, sold, and distributed ranitidine globally since 1983.[10]

56.     Throughout the time that Sanofi controlled the OTC Zantac NDAs, Boehringer Ingelheim Promeco, S.A. de C.V. and Patheon Manufacturing Services LLC manufactured the finished drug product.

57.     Sanofi voluntarily recalled all brand-name OTC Zantac and ranitidine on October 18, 2019.

58.     Pfizer and Boehringer Ingelheim have made demands for indemnification per the Stock and Asset Purchase Agreement against J&J for legal claims related to OTC Zantac products.

59.     Sanofi has made a demand for indemnification against J&J pursuant to a 2016 Asset Purchase Agreement between J&J and Sanofi.

60.     The times during which each company manufactured and sold branded Zantac are alleged below:

| Manufacturer/ Repackager | Product Name | Prescription or Over the Counter | Sale Start Date Year | Sale End Date Year |
|---|---|---|---|---|
| GlaxoSmithKline | Pills, Syrup, and Injection | Prescription | 1983 | 2019 |
| Pfizer | Pills | OTC | 1998 | 2006 |
| Boehringer Ingelheim | Pills | OTC | 2007 | 2016 |
| Sanofi | Pills | OTC | 2017 | 2019 |

---

[10] SANOFI_ZAN_MDL_0000208478.

11

## II.  NDMA IS A CARCINOGEN WHOSE DANGEROUS PROPERTIES ARE WELL ESTABLISHED

61.     According to the Environmental Protection Agency, "NDMA is a semivolatile organic chemical that forms in both industrial and natural processes."[11]  It is one of the simplest members of a class of N-nitrosamines, a family of potent carcinogens.  Scientists have long recognized the dangers that NDMA poses to human health.  A 1979 news article noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[12]  NDMA is no longer produced or commercially used in the United States except for research.  Its only use today is to cause cancer in laboratory animals.

62.     Both the EPA and the International Agency for Research on Cancer (IARC) classify NDMA as a probable human carcinogen.[13]

63.     The IARC classification is based upon data that demonstrates NDMA "is carcinogenic in all animal species tested: mice, rats, Syrian gold, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, various fish, newts and frogs.  It induces benign and malignant tumors following its administration by various routes, including ingestion and inhalation, in various organs in various species."  Further, in 1978, IARC stated that NDMA

---

[11] U.S. Environmental Protection Agency, *Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA)* (Nov. 2017), https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[12] Jane Brody, *Bottoms Up: Alcohol in Moderation Can Extend Life*, The Globe & Mail (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger Grows as Officials Unable to Trace Poison in Reserve's Water*, The Globe & Mail (CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); Kyrtopoulos et al, *DNA Adducts in Humans After Exposure to Methylating Agents*, 405 Mut. Res. 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumors, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

[13] *See* EPA Technical Fact Sheet, *supra* note 12; Int'l Agency for Research on Cancer (IARC), *Summaries & Evaluations, N-NITROSODIMETHYLAMINE* (1978), http://www.inchem.org/documents/iarc/vol17/n-nitrosodimethylamine.html.

"should be regarded for practical purposes as if it were carcinogenic to humans."[14]

64.     The American Conference of Governmental Industrial Hygienists classifies NDMA as a confirmed animal carcinogen.[15]

65.     The Department of Health and Human Services (HHS) states that NDMA is reasonably anticipated to be a human carcinogen.[16]  This classification is based upon HHS's findings that NDMA caused tumors in numerous species of experimental animals, at several different tissue sites, and by several routes of exposure, with tumors occurring mainly in the liver, respiratory tract, kidney, and blood vessels.[17]

66.     The FDA considers NDMA a carcinogenic impurity[18] and chemical that "could cause cancer" in humans.[19]  The FDA recognizes that NDMA is "known to be toxic."[20]

67.     The World Health Organization states that there is "conclusive evidence that NDMA is a potent carcinogen" and that there is "clear evidence of carcinogenicity."[21] NDMA belongs to the so-called "cohort of concern" which is a group of highly potent mutagenic carcinogens that have been classified as probable human carcinogens.[22]

---

[14] 17 Int'l Agency for Research on Cancer, *IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans, Some N-Nitroso Compounds* 151–52 (May 1978).

[15] *See* EPA Technical Fact Sheet, *supra* note 12.

[16] *Id.* at 3.

[17] *Id.*

[18] ApotexCorp_0000000786.

[19] FDA Statement, Janet Woodcock, Director – Ctr. for Drug Evaluation & Research, *Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine* (Sept. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine.

[20] Amneal_prod 1 _ 0000002938.

[21] World Health Org., *Guidelines for Drinking Water Quality, N-Nitrosodimethylamine (NDMA)* (3d ed. 2008), https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf.

[22] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH), Assessment and Control of DNA Reactive (Mutagenic) Impurities in

13

68.     NDMA is among the chemicals known to the state of California to cause cancer (Title 27, California Code of Regulations, Section 27001), pursuant to California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65).

69.     The EMA has referred to NDMA as "highly carcinogenic."  It recommended that "primary attention with respect to risk for patients should be on these highly carcinogenic N-nitrosamines" (including NDMA), and categorized NDMA as "of highest concern with respect to mutagenic and carcinogenic potential."[23]

70.     In 1989, the Agency for Toxic Substances and Disease Registry (ATSDR) stated that it is "reasonable to expect that exposure to NDMA by eating, drinking or breathing could cause cancer in humans" and that the "carcinogenicity of orally-administered NDMA has been demonstrated unequivocally in acute, intermediate and chronic durations studies" in animals and "it is important to recognize that this evidence also indicates that oral exposures of acute and intermediate duration are sufficient to induce cancer." Moreover, "hepatoxicity has been demonstrated in all animal species that have been tested and has been observed in humans who were exposed to NDMA by ingestion or inhalation." [24]

71.     The International Register of Potentially Toxic Chemicals (IRPTC 1988) lists regulations imposed by 13 countries for NDMA for occupational exposure, packing, storing and transport, disposal, and warns of its probable human carcinogenicity and its high level of toxicity by ingestion or inhalation.

---

Pharmaceuticals to Limit Potential Carcinogenic Risk, M7(R1), March 2017; https://database.ich.org/sites/default/files/M7_R1_Guideline.pdf.

[23] Nitrosamines EMEA-H-A5(3)-1490 - Assessment Report (europa.eu) (June 25, 2020), https://www.ema.europa.eu/en/documents/referral/nitrosamines-emea-h-a53-1490-assessment-report_en.pdf.

[24] ATSDR Toxicological Profile For N-Nitrosodimethylamine (December 1989), http://www.atsdr.cdc.gov/toxprofiles/tp141.pdf.

72.     OSHA classifies NDMA as "a carcinogen" that requires special and significant precautions along with specific hazard warnings.[25]

73.     A review of Defendants' own internal documents reveals that there is simply no question of material fact that it has been widely known within the medical and scientific community for over 40 years that NDMA is toxic and a known carcinogen.

74.     In September 2019, GSK prepared a Hazard Assessment Report relating to NDMA which classified it as a carcinogen stating, "there is overwhelming evidence that NDMA is mutagenic and clastogenic."[26]   In addition, GSK noted that "qualitatively, the metabolism of NDMA appears to be similar in humans and animals; as a result, it is considered highly likely that NDMA is carcinogenic to humans, potentially at relatively low levels of exposure." *Id*. GSK concluded that "NDMA is a genotoxic carcinogen, and exposure should be reduced to the extent possible." *Id*.

75.     GSK admits in an internal risk assessment dated October 2019, that NDMA is classified as a "OHC 5 exposure classification carcinogen" and should only be handled in "class 2 safety cabinet with enhanced controls, e.g., lab coat, safety glasses, double gloves" with oversleeves and the outer pair of gloves covering the wrists and changed routinely.[27] In fact, GSK's 2013 internal guidance documents recognize that "[N]itrosamines are not considered new contaminants; their potential carcinogenic effects have been studied for over 40 years."[28] Specific to NDMA, GSK states that Canada considers "NDMA to be toxic"; Germany has "classified NDMA as a suspected human carcinogen"; the UK recognizes "any concentration [of NDMA]

---

[25] 29 C.F.R § 1910.1003 (2012).
[26] GSKZAN0000236640.
[27] GSKZAN0000369506.
[28] GSKZAN0000257640.

present can be a potential hazard" and requires specific actions to minimize risk; California considers NDMA a chemical "known to the state of California to cause cancer"; Massachusetts has set guidelines in relation to NDMA in drinking water "to minimize concentrations of carcinogens"; and NDMA is "classified by IARC and the EU as category 1b carcinogens".[29]

76.    In a 2019 internal communication regarding the NDMA found in Zantac, GSK admits that NDMA is reasonably anticipated to be a human carcinogen based on sufficient evidence of carcinogenicity from studies on experimental animals.[30] Subsequently, GSK sent a "Dear Healthcare Provider" letter to the medical community echoing the above statement.[31] Another internal GSK communication awareness document titled "Ranitidine – Risk of NDMA formation in-vivo" stated "NDMA is a known carcinogen"[32] and provided guidance on how to communicate with regulatory authorities should they receive inquiries while internal emails between GSK scientists also confirm that "the carc[inogenicity] of NDMA is well documented, positive in all species tested and tumours in several organs (see WHO paper)."[33]

77.    Likewise, Defendant Sanofi admitted in its Recall Standby Statement that NDMA has been classified "as a probable human carcinogen (substance that could cause cancer)."[34] Defendant Sanofi prepared a Health Hazard Evaluation in 2019, which stated "NDMA is a known mutagenic carcinogen" in animals and "should be regarded for practical purposes if it was carcinogenic to humans."[35] Moreover, "NDMA requires metabolic activation to express its

---

[29] *Id.*
[30] GSKZAN0000163882.
[31] *See* GSK Dear HCP Letter, (October 3, 2019), publicly available (for example, https://www.hpra.ie/docs/default-source/Safety-Notices/gsk-hcp-letter-03oct2019.pdf).
[32] GSKZAN0000178581.
[33] GSKZAN0000172037.
[34] SANOFI_ZAN_MDL_0000169790.
[35] SANOFI_ZAN_MDL_0000206858.

mutagenic and carcinogenic effects and this metabolism route exists in rodents and man." *Id*.

78.    Dr. Reddy's admitted in internal protocols for assessment of nitrosamine impurities that "NDMA, NDEA, NMBA, NENPA, NDIPA, NDBA, and EIPNA impurities are genotoxic (mutagenic) and carcinogenic impurities."[36]  In a Summary of Actions related to the NDMA impurity in Ranitidine, Dr. Reddy's stated that "based on the drug product and drug substance test data for NDMA, there is presence of NDMA in Ranitidine medicine. The levels are at varying concentrations in each batch tested showing results above and below the allowable daily recommended level of .32 ppm.  Based on the Health Hazard Assessment and the public alert issued by FDA, the NDMA in levels more than .32 ppm daily exposure over a prolonged period of consumption is not safe to the health of consumer."[37]  Dr. Reddy's investigation found that Ranitidine API might inherently undergo degradation to form NDMA and use of recovered solvents would further allow enrichment of NDMA in the drug substance.[38]

79.    In a 2019 Health Hazard Assessment prepared by Dr. Reddy's, it was concluded that "Based on available information it is noted that there is a presence of NDMA in ranitidine hydrochloride above acceptable limits. Hence there is a chance that patient may experience acute or chronic adverse effects due to NDMA."[39]  Potential chronic side effects were noted to include "carcinogenic effects, damage to developing foetus, damage to liver and kidneys." *Id*.

80.    Apotex admitted in its internal health hazard assessment dated September 18, 2019, that "NDMA is a probable human carcinogen based on results of laboratory tests" and that "cancer is clearly the critical end-point for quantitation of exposure-response for risk characterization of

---

[36] DRLMDL0000077291.
[37]DRLMDL0000070414.
[38] *Id*.
[39] DRLMDL0000069991.

NDMA."[40]

81.     Glenmark admitted in its recall notification letter that "a carcinogenic impurity, NDMA, has been found in ranitidine medications at levels exceeding the FDA allowable limit."[41]

82.     Lannett admitted in its press release regarding its recall of ranitidine syrup that "NDMA is classified as a probable human carcinogen or substance that can cause cancer."[42]

83.     Wockhardt admitted in a response to the FDA that "NDMA is a potential carcinogen impurity."[43]

84.     Aurobindo admitted in its recall notice that NDMA is "classified as a probable human carcinogen."[44] In addition, Aurobindo performed a root cause analysis and found that NDMA in ranitidine was found "to be elevated with time" and "pH, heat, product nature and humidity play a role in NDMA formation."[45] Aurobindo further concluded that the "probable human carcinogen NDMA was determined to be present in concentrations that are out of specification and exceed the maximum acceptable limit" and "it cannot be stated with absolute certainty that there is no potential for long term risk of carcinogenesis in a very small number of patients who might be chronically exposed to NDMA-contaminated ranitidine syrup." [46]

85.     As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

86.     Most recently, beginning in the summer of 2018, there have been recalls of several generic drugs used to treat high blood pressure and heart failure—Valsartan, Losartan, and

---

[40] ApotexCorp_0000030734.
[41] GiantEagle_MDL2924_00000303.
[42] LANNETT0006894.
[43] WOCKHARDT00014477.
[44] Aurobindo_prod2__0000000668.
[45] Aurobindo_prod2__0000000465.
[46] *Id.*

Irbesartan—because the medications contained nitrosamine impurities that do not meet the FDA's safety standards.

87.    This continued in 2020 when the FDA required recalls of numerous generic manufacturers' metformin, including metformin made by Apotex, Amneal, Granules, Sun Pharmaceuticals, Nostrum, and Teva.[47]

88.    NDMA is a genotoxin which interacts with DNA and may subsequently induce mutations.  Genotoxins are not considered to have a safe threshold or dose due to their ability to alter DNA.

89.    The FDA has set an acceptable daily intake (ADI) level for NDMA at 96 ng.  That means that consumption of 96 ng of NDMA a day would increase the risk of developing cancer by 0.001% over the course of a lifetime.  That risk increases as the level of NDMA exposure increases.  However, any level above 96 ng is considered unacceptable.[48]

90.    In studies examining carcinogenicity through oral administration, mice exposed to NDMA developed cancer in the kidney, bladder, liver, and lung.  In comparable rat studies, cancers were observed in the liver, kidney, pancreas, and lung.  In comparable hamster studies, cancers were observed in the liver, pancreas, and stomach.  In comparable guinea-pig studies, cancers were observed in the liver and lung.  In comparable rabbit studies, cancers were observed in the liver and lung.

91.    In other long-term animal studies in mice and rats using different routes of

---

[47] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-metformin.

[48] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)* (Feb. 28, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.

19

exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer was observed in the lung, liver, kidney, nasal cavity, and stomach.

92.     Before the withdrawal of ranitidine, it was considered a category B drug for birth defects, meaning it was considered safe to take during pregnancy.  Yet animals exposed to NDMA during pregnancy birthed offspring with elevated rates of cancer in the liver and kidneys.

93.     NDMA is a very small molecule.  That allows it to pass through the blood-brain and placental barrier.  This is particularly concerning as ranitidine has been marketed for pregnant women and young children for years.

94.     Exposure to high levels of NDMA has been linked to liver damage in humans.[49]

95.     Many *in vitro* studies confirm that NDMA is a mutagen—causing genetic mutations in human and animal cells.

96.     Overall, the animal data demonstrates that NDMA is carcinogenic in all animal species tested: mice; rats; Syrian golden, Chinese and European hamsters; guinea pigs; rabbits; ducks; mastomys; fish; newts; and frogs.

97.     The EPA classified NDMA as a probable human carcinogen "based on the induction of tumors at multiple sites in different mammal species exposed to NDMA by various routes."[50]

98.     Pursuant to EPA cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."[51]

99.     In addition to the overwhelming animal data linking NDMA to cancer, there are

---

[49] *See* EPA Technical Fact Sheet, *supra* note 12.
[50] *Id.*
[51] *See* U.S. Envtl. Protection Agency, Risk Assessment Forum, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005), https://www3.epa.gov/airtoxics/cancer_guidelines_final_3-25-05.pdf.

20

numerous human epidemiological studies exploring the effects of dietary exposure to various cancers. These studies consistently show increased risks of various cancers.

100. In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 220 cases, researchers observed a statistically significant 700% increased risk of gastric cancer in persons exposed to more than 0.51 micrograms/day.[52]

101. In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 746 cases, researchers observed statistically significant elevated rates of gastric cancer in persons exposed to more than 0.191 micrograms/day.[53]

102. In another 1995 epidemiological case-control study looking at, in part, the effects of dietary consumption on cancer, researchers observed a statistically significant elevated risk of developing aerodigestive cancer after being exposed to NDMA at 0.179 micrograms/day.[54]

103. In a 1999 epidemiological cohort study looking at NDMA dietary exposure with 189 cases and a follow up of 24 years, researchers noted that "*N*-nitroso compounds are potent carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.[55]

104. In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA

---

[52] Pobel et al., *Nitrosamine, Nitrate and Nitrite in Relation to Gastric Cancer: A Case-control Study in Marseille, France*, 11 Eur. J. Epidemiol. 67–73 (1995).

[53] La Vecchia, *et al*., *Nitrosamine Intake & Gastric Cancer Risk*, 4 Eur. J. Cancer Prev. 469–74 (1995).

[54] Rogers et al., *Consumption of Nitrate, Nitrite, and Nitrosodimethylamine and the Risk of Upper Aerodigestive Tract Cance*r, 5 Cancer Epidemiol. Biomarkers Prev. 29–36 (1995).

[55] Knekt et al., *Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate, Nitrite and N-nitroso Compounds: A Follow-Up Study*, 80 Int. J. Cancer 852–56 (1999).

exposure for esophagus, oral cavity, and pharynx cancer.[56]

105.    In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with increased cancer risk in men and women" for all cancers, and that "NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.[57]

106.    In a 2014 epidemiological case-control study looking at NDMA dietary exposure with 1,760 cases, researchers found a statistically significant elevated association between NDMA exposure and rectal cancer.[58]

107.    NDMA is also known to be genotoxic—meaning, it can cause DNA damage in human cells.  Indeed, multiple studies demonstrate that NDMA is genotoxic both *in vivo* and *in vitro*.  However, recent studies have shown that the ability of NDMA to cause mutations in cells is affected by the presence of enzymes typically found in living humans, suggesting that "humans may be especially sensitive to the carcinogenicity of NDMA."[59]

108.    In addition to studies demonstrating that NDMA directly causes cancer, research shows that exposure to NDMA (1) can exacerbate existing but dormant (*i.e.*, not malignant) tumor cells; (2) promote otherwise "initiated cancer cells" to develop into cancerous tumors; and (3) reduce the ability of the body to combat cancer as NDMA is immunosuppressive.  Thus, in addition to NDMA being a direct cause of cancer itself, NDMA can also be a contributing factor to a cancer

---

[56] Straif et al., *Exposure to High Concentrations of Nitrosamines and Cancer Mortality Among a Cohort of Rubber Workers*, 57 Occup. Envtl. Med 180–87 (2000).

[57] Loh et al., *N-nitroso Compounds and Cancer Incidence: The European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 Am. J. Clinical Nutrition 1053–61 (2011).

[58] Zhu et al., *Dietary N-nitroso Compounds and Risk of Colorectal Cancer: A Case-control Study in Newfoundland and Labrador and Ontario, Canada*, 111 Brit. J. Nutrition 6, 1109–17 (2014).

[59] World Health Org., *supra* note 22.

injury caused by some other source.

## III. NDMA IS DISCOVERED IN RANITIDINE-CONTAINING PRODUCTS, LEADING TO MARKET WITHDRAWAL

109.    On September 9, 2019, pharmacy and testing laboratory Valisure LLC and ValisureRX LLC (collectively, "Valisure") filed a Citizen Petition calling for the recall of all ranitidine-containing products due to detecting exceedingly high levels of NDMA when testing ranitidine pills using gas chromatography-mass spectrometry.  FDA and European regulators started reviewing the safety of ranitidine with specific focus on the presence of NDMA.[60]  This set off a cascade of recalls by the Defendants.

110.    On September 13, 2019, the FDA's Director for Drug Evaluation and Research, Dr. Janet Woodcock, issued a statement warning that some ranitidine medicines may contain NDMA.[61]

111.    On October 2, 2019, the FDA ordered manufacturers of ranitidine to test their products and recommended using a liquid chromatography with high resolution mass spectrometer (LC-HRMS) testing protocol, which "does not use elevated temperatures."[62]

112.    On October 8, 2019, GSK voluntarily recalled all ranitidine-containing products internationally.[63]  As part of the recall, GSK publicly acknowledged that unacceptable levels of

---

[60] FDA Statement, Woodcock, *supra* note 20; Press Release, European Medicines Agency, *EMA to Review Ranitidine Medicines Following Detection of NDMA* (Sept. 13, 2019), https://www.ema.europa.eu/en/news/ema-review-ranitidine-medicines-following-detection-ndma.

[61] FDA Statement, Woodcock, *supra* note 20.

[62] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Oct. 2, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[63] Press Release, Gov. UK, *Zantac – MHRA Drug Alert Issued as GlaxoSmithKline Recalls All Unexpired Stock* (Oct. 8, 2019), https://www.gov.uk/government/news/zantac-mhra-drug-alert-issued-as-glaxosmithkline-recalls-all-unexpired-stock.

23

NDMA were discovered in Zantac and noted that "GSK is continuing with investigations into the potential source of the NDMA."[64]

113.   On October 18 and 23, 2019, Defendant Sanofi voluntarily recalled all of its ranitidine-containing products.[65]

114.   On November 1, 2019, the FDA announced the results of recent testing, finding unacceptable levels of NDMA in ranitidine-containing products, and requested that drug makers begin to voluntarily recall their ranitidine-containing products if the FDA or manufacturers discovered NDMA levels above the acceptable limits.[66]

115.   On December 4, 2019, the FDA issued a statement notifying consumers who wished to continue taking ranitidine to consider limiting their intake of nitrite-containing foods, *e.g.*, processed meats and preservatives like sodium nitrite.[67]  This advice ***mirrored*** an admonition issued by Italian scientists in 1981 after finding that ranitidine reacted with nitrites *in vitro* to form toxic and mutagenic effects in bacteria.  The prudent advice of Dr. de Flora published in October 1981 in *The Lancet* was to "avoid nitrosation as far as possible by, for example, suggesting a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals or by giving inhibitors of nitrosation such as ascorbic acid."[68]  If GSK had only heeded Dr. de Flora's

---

[64] Justin George Varghese, *GSK Recalls Popular Heartburn Drug Zantac Globally After Cancer Scare*, Reuters (Oct. 8, 2019), https://www.reuters.com/article/us-gsk-heartburn-zantac/gsk-recalls-popular-heartburn-drug-zantac-globally-after-cancer-scare-idUSKBN1WN1SL.

[65] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Oct. 23, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[66] U.S. Food & Drug Admin., Laboratory Tests | Ranitidine, https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-tests-ranitidine (content current as of Nov. 1, 2019).

[67] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Dec. 4, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[68] Silvio de Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, The Lancet, Oct. 31, 1981, at 993–94.

24

advice in 1981, millions of people might have avoided exposure to NDMA formed as a result of ranitidine's interaction with the human digestive system.

116.   On January 2, 2020, research laboratory, Emery Pharma, submitted a Citizen Petition to the FDA, showing that the ranitidine molecule is heat-liable and under certain temperatures progressively accumulates NDMA.

117.   Emery's Citizen Petition outlined its substantial concern that ranitidine is a time- and temperature-sensitive pharmaceutical product that develops NDMA when exposed to heat, a common occurrence during shipping, handling, and storage.  Emery requested that the FDA issue a directive to manufacturers to clearly label ranitidine with a warning that "by-products that are probable carcinogens can be generated if exposed to heat."  In addition to warning about this condition, Emery requested agency directives to manufacturers and distributors to ship ranitidine products in temperature-controlled vehicles.[69]

118.   In response,[70] on April 1, 2020, the FDA recounted that a recall is an "effective methods [sic.] of removing or correcting defective FDA-regulated products . . . particularly when those products present a danger to health."[71]   The FDA sought the voluntary consent of manufacturers to accept the recall "to protect the public health from products that present a risk of injury."[72]  The FDA found that the recall of all ranitidine-containing products and a public warning of the recall was necessary because the "product being recalled presents a serious health risk."[73]

---

[69] Emery Pharma FDA Citizen Petition (Jan. 2, 2020) https://emerypharma.com/news/emery-pharma-ranitidine-fda-citizen-petition/.

[70] Letter of Janet Woodcock, U.S. Food & Drug Admin., Docket No. FDA-2020-P-0042 (Apr. 1, 2020), *available at* https://emerypharma.com/wp-content/uploads/2020/04/FDA-2020-P-0042-CP-Response-4-1-2020.pdf.

[71] *Id.* at 5 (*citing* 21 C.F.R. 7.40(a)).

[72] *Id.*

[73] *Id.* at 7.

25

The FDA therefore sent Information Requests to all applicants and pending applicants of ranitidine-containing products "requesting a market withdrawal."[74]

119.    The FDA found its stability testing raised concerns that NDMA levels in some ranitidine-containing products stored at room temperature can increase with time to unacceptable levels.  In the same vein, FDA testing revealed that higher NDMA levels were found as the products approached their expiration dates.  The FDA's testing eroded the agency's confidence that any ranitidine-containing product would remain stable through its labeled expiration date.  So, the FDA requested a market withdrawal of all ranitidine products.  The FDA also announced to the public that the Agency's laboratory tests show that temperature and time contribute to an increase in NDMA levels in some ranitidine products.  The FDA's decision to withdraw the drug rendered moot Emery's request for temperature-controlled shipping conditions.

120.    The FDA's reaction mirrored comparable regulatory action throughout the world. Before the FDA acted, over 43 countries and jurisdictions restricted or banned ranitidine-containing products.[75]

121.    The European Medicines Agency (EMA), the European Union's equivalent to the FDA, through an Article 31 Referral, determined the sale of all ranitidine-containing products should be suspended on September 19, 2019.  On April 30, 2020, the Human Medicines Committee of the EMA "has recommended the suspension of all ranitidine medicines in the EU due to the presence of low levels of an impurity called N-nitrosodimethylamine (NDMA)."  The EMA recognizes NDMA as a probable human carcinogen and issued a "precautionary suspension of

---

[74] *Id.* at 10 n.43.

[75] Margaret Newkirk & Susan Berfield, *FDA Recalls Are Always Voluntary and Sometimes Haphazard—and The Agency Doesn't Want More Authority to Protect Consumers*, Bloomberg Businessweek (Dec. 3, 2019), https://www.bloomberg.com/graphics/2019-voluntary-drug-recalls-zantac/.

these medicines in the EU" because "NDMA has been found in several ranitidine medicines above levels considered acceptable, and there are unresolved questions about the source of the impurities."[76]

122.    On September 17, 2020, after a ranitidine manufacturer requested that the EMA re-examine its decision and permit ranitidine to be marketed again in the EU, the EMA confirmed its prior recommendation to suspend all ranitidine medicines in the EU due to the presence of NDMA noting that it is a probable human carcinogen and that there is evidence that NDMA forms from the degradation of ranitidine itself with increasing levels seen over shelf life.[77]

### IV. HOW RANITIDINE TRANSFORMS INTO NDMA

123.    The ranitidine molecule itself contains the constituent molecules to form NDMA. *See* Figure 1.



**Figure 1 – Diagram of Ranitidine & NDMA Molecules**

**Ranitidine Molecule**

**NDMA Molecule**

124.    The degradation occurs independently in two parts of the ranitidine molecule, with

---

[76] Eur. Med. Agency, *Suspension of Ranitidine Medicines in the EU* (Apr. 30, 2020), https://www.ema.europa.eu/en/documents/referral/ranitidine-article-31-referral-suspension-ranitidine-medicines-eu_en.pdf.

[77] Eur. Med. Agency, EMA Confirms Recommendation to Suspend All Ranitidine Medicines in the EU (Nov. 24, 2020), https://www.ema.europa.eu/en/documents/referral/ranitidine-article-31-referral-ema-confirms-recommendation-suspend-all-ranitidine-medicines-eu_en.pdf.

the products of the degradation combining to produce NDMA.

125.    The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the U.S. water supply.[78]  Indeed, in 2003, alarming levels of NDMA in drinking water processed by wastewater-treatment plants were specifically linked to the presence of ranitidine.[79]

126.    The high levels of NDMA observed in ranitidine-containing products are a function of various factors.  The ranitidine molecule internally degrades to form NDMA.  The degradation of ranitidine can increase over time under normal storage conditions, but more so with exposure to heat and/or humidity.  Once in the body, ranitidine continues to degrade and can yield increasing levels of NDMA in the human digestive system, and when it interacts with nitrogenous products.

A.  **Formation of NDMA in the Environment of the Human Stomach**

127.    When the ranitidine molecule is exposed to the acidic environment of the stomach, particularly when accompanied by nitrites (a chemical commonly found in heartburn-inducing foods), the Nitroso molecule (0=N) and the DMA molecule ($H_3C-N-CH_3$) break off and reform as NDMA.

128.    In 1981, Dr. Silvio de Flora, an Italian researcher from the University of Genoa, published the results of experiments he conducted on ranitidine in the well-known journal, *The Lancet*.  When ranitidine was exposed to human gastric fluid in combination with nitrites, his experiment showed "toxic and mutagenic effects."[80]  Dr. de Flora hypothesized that these

---

[78] Ogawa et al., *Purification and Properties of a New Enzyme, NG, NG-dimethylarginine Dimethylaminohydrolase, from Rat Kidney*, 264 J. Bio. Chem. 17, 10205–209 (1989).

[79] Mitch et al., *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*, 20 Env. Eng. Sci. 5, 389–404 (2003).

[80] De Flora, *supra* note 69.

mutagenic effects could have resulted from the "formation of more than one nitroso derivative [which includes NDMA] under our experimental conditions." *Id.*  Dr. de Flora cautioned that, in the context of ranitidine ingestion, "it would seem prudent to … suggest[] a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals."[81]  *Id.*

129.   GSK knew of Dr. de Flora's publication because, two weeks later, GSK responded in *The Lancet*, claiming that the levels of nitrite needed to induce the production of nitroso derivatives (*i.e.*, NDMA) were not likely to be experienced by people in the real world.[82]

130.   This response reflects GSK's reputation for "adopting the most combative, scorched-earth positions in defense of its brands."[83]  The company has no compunctions against distorting objective science to maintain its lucrative monopoly franchises, and its egregious conduct surrounding Zantac is not some isolated incident.

131.   GSK endangered patient health while reaping billions of dollars in profits from Paxil, Wellbutrin, and Avandia.  As we now know, the company was involved in covering up scientific data, offering illegal kickbacks to prescribing physicians, intimidating witnesses, and defrauding Medicare to profit from these medicines.  In the wake of Congressional hearings into the company's outrageous misbehavior,[84] GSK's actions resulted in a criminal investigation and

---

[81] This admonition came two years before the FDA approved Zantac in 1983.  Notwithstanding, in 1998 GSK applied for and obtained an indication for OTC Zantac "[f]or the prevention of meal-induced heartburn at a dose of 75 mg taken 30 to 60 minutes prior to a meal." *See* Ctr. for Drug Eval. & Research, *Approval Package* (June 8, 1998), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/20520s1_Zantac.pdf.  So, GSK specifically invited patients to take Zantac shortly before eating heartburn-inducing food.

[82] R. T., Brittain et al., *Safety of Ranitidine*, *The Lancet* 1119 (Nov. 14, 1981).

[83] Jim Edwards, *GSK's Alleged Coverup of Bad Avandia Data: A Snapshot of Its Poisonous Corporate Culture*, Moneywatch (July 13, 2010) https://www.cbsnews.com/news/gsks-alleged-coverup-of-bad-avandia-data-a-snapshot-of-its-poisonous-corporate-culture/.

[84] *Staff Report on GlaxoSmithKline and the Diabetes Drug Avandia*, Senate Comm. on Finance, 111th Cong.2d Sess. 1 (Comm. Print Jan. 2010).

29

the then-largest guilty plea by a pharmaceutical company for fraud and failure to report safety data in the country's history.[85]

132.    GSK attended an FDA Advisory Committee in May 1982 where its representative testified and presented evidence relating to the safety of Zantac, including the potential for ranitidine to form nitrosamines.  However, GSK failed to disclose its new evidence relating to ranitidine and the formation of a nitrosamine, specifically the formation of NDMA.[86]

133.    One month later, in June 1982, GSK submitted its draft Summary Basis of Approval and labeling for Zantac.  Again, GSK failed to submit or otherwise disclose its new evidence relating to ranitidine and the formation of NMDA.[87]

134.    In its submission to the FDA, GSK discussed its findings from internal studies performed in 1980 that ranitidine formed a different nitrosamine, n-nitroso-nitrolic acid, a potent mutagen, but explained that these results had no "practical clinical significance"[88]:

> Although N-nitroso-nitrolic acid was a potent mutagen, it is not likely to be formed in the stomach of a patient ingesting ranitidine, as an unrealistically large amount of nitrite needs to be present to form and maintain the nitrosamine.  For this reason, and also because ranitidine was not carcinogenic in life-span studies in rodents, the in vitro nitrosation of ranitidine to a mutagenic nitrosamine does not seem to have practical clinical significance.

135.    In 1980—before Zantac was approved by the FDA—GSK conducted another study

---

[85] U.S. Dep't of Justice, *GlaxoSmithKline to Please Guilty and Pay $3 Billion to Resolve Fraud Allegations and Failure to Report Safety Data* (July 2, 2012), https://www.justice.gov/opa/pr/glaxosmithkline-plead-guilty-and-pay-3-billion-resolve-fraud-allegations-and-failure-report.

[86] GSKZAN0000050413.

[87] GSKZNDAA0000071900.

[88] Excerpted from the Summary Basis of Approval submitted to the FDA to obtain approval of Zantac in the early 1980s.  This document was obtained through a Freedom of Information Act request to the FDA.

to examine, among other things, how long-term use of ranitidine could affect the levels of nitrite in the human stomach.[89]  Remarkably, GSK admitted that ranitidine use caused the proliferation of bacteria in the human stomach that are known to convert nitrates to nitrites, which leads to elevated levels of nitrite in the stomach environment.  GSK acknowledged this could increase the risk of forming nitrosamines and, in turn, cancer, but then dismissed this risk because people were allegedly only expected to use ranitidine-containing products for a short-term period:

```
The importance of this finding is not clear.  High levels of
nitrite could react with certain organic compounds to form
nitrosamines, which are known carcinogens.  To date, however,
neither ranitidine nor cimetidine have been carcinogenic in
rodents, so the level of human risk cannot be estimated from
animal studies.  Ranitidine is recommended only for short-term
use and carcinogenic risk, if any, should thus be minimized.
```

136.    GSK knew—and indeed specifically admitted—that ranitidine could react with nitrite in the human stomach to form nitrosamines and, at the same time, that long-term use of ranitidine could lead to elevated levels of nitrite in the human stomach.  GSK also knew but did not disclose that it had new evidence showing that NDMA was generated by ranitidine under certain conditions.

137.    In response to Dr. de Flora's findings, in 1982, GSK conducted a clinical study specifically investigating gastric contents in human patients.[90]  The study, in part, specifically measured the levels of N-Nitroso compounds in human gastric fluid.  GSK indicated that there were no elevated levels, and even published the results of this study five years later, in 1987.  The study, however, was flawed.  It did not use gold-standard mass spectrometry to test for NDMA,

---

[89] The results of this study are discussed in the Summary Basis of Approval, obtained from the FDA.

[90] Thomas et al., *Effects of One Year's Treatment with Ranitidine and of Truncal Vagotomy on Gastric Contents*, 6 Gut. Vol. 28, 726–38 (1987).

but instead, used a process that could not measure N-nitrosamines efficiently.  And worse, in the testing it did do, GSK refused to test gastric samples that contained ranitidine in them out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded."[91]  In other words, GSK intentionally engineered the study to exclude the very samples most likely to contain a dangerous carcinogen.

138.    Given the above information that was disclosed relating to the nitrosation potential and formation of nitrosamines, it is shocking that GSK conducted an internal study to assess the formation of NDMA and found that ranitidine, when exposed to sodium nitrite, formed hundreds of thousands of nanograms of NDMA.  The GSK study was never published or disclosed to the public.

139.    In 1983, the same year GSK started marketing Zantac in the United States, seven researchers from the University of Genoa published a study discussing ranitidine and its genotoxic effects (ability to harm DNA).[92]  The researchers concluded "it appears that reaction of ranitidine with excess sodium nitrite under acid conditions gives rise to a nitroso-derivative (or derivatives) [like NDMA] capable of inducing DNA damage in mammalian cells."  *Id.*

140.    Then, again in 1983, Dr. de Flora, along with four other researchers, published their complete findings.[93]  The results "confirm our preliminary findings on the formation of genotoxic derivatives from nitrite and ranitidine."  Again, the authors noted that, "the widespread clinical use [of ranitidine] and the possibility of a long-term maintenance therapy suggest the prudent adoption of some simple measures, such as a diet low in nitrates and nitrites or the prescription of these anti-

---

[91] *Id.*

[92] Maura et al., *DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells*, 18 Tox. Lttrs. 97–102 (1983).

[93] De Flora et al., *Genotoxicity of Nitrosated Ranitidine*, 4 Carcinogenesis 3, 255–60 (1983).

ulcer drugs at a suitable interval from meals." This admonition carries weight considering GSK's studies show that long-term ranitidine consumption, itself, leads to elevated levels of nitrites in the human gut.

141. In addition, as multiple Defendants have noted in internal documents and recent submissions to regulatory authorities, a mechanism for ranitidine to form NDMA "would be from the nitrosation of DMA which could be released during ranitidine biotransformation through a de-alkylation/oxidative deamination process. In this case, the counterpart (i.e., furoic acid) should be released as well," however, only one study was located that demonstrated furoic acid was released in the urine of animals and they could not locate any studies where this metabolic pathway was reported in humans.[94] Therefore, this potential mechanism was disregarded.

142. After conducting radiolabeled ranitidine studies in animals that demonstrated the release of furoic acid in urine, GSK specifically studied whether furoic acid was released upon ingestion of ranitidine in humans in the early 80's. The first study performed in 1982 did not detect the furoic acid analogue in humans. This report was provided to the FDA on August 3, 1982.[95]

143. However, in 1985 GSK conducted a radioisotope study to again investigate the metabolic disposition of ranitidine in man and found that the "furoic acid metabolite was identified for the first time in human urine" after ingestion of ranitidine.[96] This study was not published. This 1985 GSK internal study provided evidence that ranitidine contained DMA that was freely available to form NDMA on exposure to nitrite. In fact, in a submission to the FDA in August 2019 GSK admits formation of furoic acid metabolite would be predictive of the release of DMA

---

[94] SANOFI_ZAN_MDL-0000033849-SANOFI_ZAN_MDL_0000033891, at SANOFI_ZAN_MDL_0000033873.
[95] GSKZNDAA0000072103-GSKZNDAA0000072128.
[96] GSKZAN0000369313, (Broom, et al. A Radioisotope Study to Investigate the Metabolic Disposition of Ranitidine in Man, Glaxo Research Group Report No. WMH/85/013 1986).

which would then be available to form NDMA.  However, GSK represented to the FDA that in metabolism data in humans, the furoic acid metabolite is not detected.  To support this conclusion, GSK pointed to published internal GSK studies from 1981 and 1982 but failed to mention the unpublished internal and previously undisclosed study conducted in 1985 which did detect furoic acid in the urine of humans.[97]

> (1%). The remainder of the administered dose is found in the stool [US Zantac Prescribing Information]. The furoic acid metabolite of ranitidine has been reported to be formed in rats [Eddershaw, 1996]. It would be predicted that formation of this metabolite may also result in the release of dimethylamine (DMA) which may be available to form NDMA on exposure to nitrite. However, in publications reporting metabolism data in humans [Carey, 1981; Martin, 1981; Martin, 1982] the furoic acid metabolite of ranitidine is not detected by the Total Ion Current (TIC) chromatography using HPLC-MS.

144.    The high instability of the ranitidine molecule was elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed.[98]  These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water-treatment plants that supply many U.S. cities with water.

145.    In 2002, researchers conducted a controlled study to evaluate the concentration of nitrosamines, including NDMA, in the gastric fluid and urine in children with gastritis before and after four to six weeks of treatment with ranitidine.[99]  The study reported statistically significant increases in the nitrosamine concentration, including NDMA, in the gastric juice and urine in 93.3% of children after taking ranitidine for only four weeks.  The researchers noted that

---

[97] GSKZNDAA0000636549.

[98] Le Roux et al., *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 Envtl. Sci. Tech. 20, 11095–103 (2012).

[99] Krawczynski, et al. *Nitrosamines in Children with Chronic Gastritis*, Journal of the Polish Pediatric Society (GSKZAN0000235261).

nitrosamines belong to the most potent known carcinogens, and no organisms have been found that would be resistant to the harmful effects, that neoplastic lesions induced by nitroso compounds may develop in any organ, and that nitrosamines induced a wide spectrum of tumors in studies using animal models. *Id*. In addition, the authors noted specifically that NDMA induced similar symptoms of acute poisoning in humans and animals. *Id*. They advised that prophylactic measures to avoid nitrosamine formation include a diet high in fruits and inclusion of ascorbic acid as well as limiting intake of processed meat. The conclusion was that ranitidine should only be recommended in children after careful consideration. *Id*.

146. Despite the direct evidence that children taking ranitidine were being exposed to dangerously high levels of carcinogenic nitrosamines including NDMA, Defendants recklessly continued to market and promote Zantac and/or ranitidine as safe and effective for children.

147. Similarly, in 2016, researchers at Stanford University conducted an experiment on healthy adult volunteers.[100] They measured the NDMA in urine of healthy individuals over the course of 24 hours, administered one dose of ranitidine, and then measured the NDMA in the urine of the same individuals for another 24 hours. The study reported that on average, the level of NDMA increased by 400 times, to approximately 47,000 ng. The only change during that 24-hour period was the consumption of ranitidine. In the study, the scientists further explained that previous studies have shown a high metabolic conversion rate of NDMA, meaning it will be processed by the human body. This study showed that ranitidine generates NDMA in the human body.

148. Valisure is an online pharmacy that also runs an analytical laboratory that is ISO

---

[100] Zeng et al., *Oral intake of Ranitidine Increases Urinary Excretion of N-nitrosodimethylamine*, 37 Carcinogenesis 625–34 (2016).

17025 accredited by the International Organization for Standardization (ISO)—an accreditation recognizing the laboratories technical competence for regulatory purposes. Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

149. In its September 9, 2019 Citizen's Petition to the FDA,[101] Valisure disclosed as part of its testing of ranitidine-containing products that in every lot tested there were exceedingly high levels of NDMA. Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA for the determination of NDMA levels. As per the FDA protocol, this method was validated to a lower limit of detection of 25 ng.[102] The results of Valisure's testing show levels of NDMA well above 2 million ng per 150 mg Zantac tablet, shown below in Table 1.

| Table 1 – Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
|---|---|---|
| **150 mg Tablets or equivalent** | **Lot #** | **NDMA per tablet (ng)** |
| Reference Powder | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L800819A | 2,444,046 |
| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |

---

[101] Valisure, *Citizen Petition on Ranitidine* (Sept. 9, 2019), *available at* https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf.
[102] U.S. Food & Drug Admin., *Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, FY19-005-DPA-S* (Jan. 28, 2019).

| Zantac (mint), CVS | 9AE2864 | 3,267,968 |
| Ranitidine, Equate | 9BE2772 | 2,479,872 |
| Ranitidine (mint), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

150. This testing by GC-MS demonstrates the instability of the ranitidine molecule and its propensity to break down under higher temperatures.

151. Valisure was concerned that the extremely high levels of NDMA observed in its testing were a product of the modest oven heating parameter of 130 °C in the FDA recommended GC/MS protocol. So Valisure developed a low temperature GC/MS method that could still detect NDMA but would only subject samples to 37 °C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

152. Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach. Industry standard "Simulated Gastric Fluid" ("SGF": 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF": 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs. The inclusion of nitrite in gastric fluid testing is commonplace and helps simulate the environment of a human stomach.

153. Indeed, ranitidine-containing products were specifically advertised to be used when consuming foods containing high levels of nitrates, such as tacos or pizza.[103]

---

[103] *See, e.g.*, Zantac television commercial, *Family Taco Night*, https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; Zantac television commercial, *Spicy*, https://youtu.be/jzS2kuB5_wg; Zantac television commercial, *Heartburn,* https://youtu.be/Z3QMwkSUlEg; Zantac television commercial, *Zantac Heartburn Challenge*, https://youtu.be/qvh9gyWqQns.

154. The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present (*see* Table 2).

| Table 2 – Valisure Biologically Relevant Tests for NDMA Formation | | |
|---|---|---|
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |
| Tablet without Solvent | Not Detected | Not Detected |
| Tablet | Not Detected | Not Detected |
| Simulated Gastric Fluid ("SGF") | Not Detected | Not Detected |
| Simulated Intestinal Fluid ("SIF") | Not Detected | Not Detected |
| SGF with 10 mM Sodium Nitrite | Not Detected | Not Detected |
| SGF with 25 mM Sodium Nitrite | 236 | 23,600 |
| SGF with 50 mM Sodium Nitrite | 3,045 | 304,500 |

155. Under biologically relevant conditions, when nitrites are present, high levels of NDMA are found in one dose of 150 mg ranitidine, ranging between 245 and 3,100 times above the FDA-allowable limit. One would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg ranitidine at the 25 nanogram level (over 7,000 for the 50 nanogram level).

156. Following the release of Valisure Citizen's Petition, the FDA conducted additional laboratory tests, which showed NDMA levels in all ranitidine samples it tested, including API and the finished drug, both tablets and syrup. The FDA developed simulated gastric fluid ("SGF") and simulated intestinal fluid ("SIF") models to use with the LC-MS testing method to estimate the biological significance of *in vitro* findings. These models are intended to detect the formation of NDMA in systems that approximate the stomach and intestine.

157. When the scientific data is assessed overall, the literature demonstrates that the ingestion of ranitidine already containing NDMA combined with the presence of human-relevant

38

levels of nitrite in the stomach—a substance that is common in foods that induce heartburn and that is known to be elevated in people taking ranitidine for longer than a month—the ranitidine molecule transforms into more NDMA which would dramatically increase a person's risk of developing cancer.

### B. Formation of NDMA in Other Organs of the Human Body

158.    In addition to the gastric fluid mechanisms investigated in the scientific literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase (DDAH), which can occur in other tissues and organs separate from the stomach.

159.    Valisure explained that liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways, particularly in weak acidic conditions such as that in the kidney or bladder. The original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity of DMA to form NDMA: "This report also provides a useful knowledge for an understanding of the endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine [NDMA]."[104]

---

[104] Ogawa, *et al.*, *supra* note 79.

39

160.    Valisure reported as illustrated in Figure 2, below, computational modelling demonstrates that ranitidine (shown in green) can readily bind to the DDAH-1 enzyme (shown as a cross-section in grey) in a manner similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine ("ADMA," shown in blue).



**Figure 2 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme**

| | Predicted Affinity (kcal/mol) |
|---|---|
| ADMA | $-5.9 \pm 0.2$ |
| Ranitidine | $-6.1 \pm 0.1$ |

161.    Valisure reported that these results suggest that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

40

162.    Figure 3 below, derived from the National Center for Biotechnology Information, illustrates the expression of the DDAH-1 gene in various tissues in the human body.



Figure 3 – Expression levels of DDAH-1 enzyme by Organ

163.    DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the brain, colon, liver, small intestine, stomach, bladder, and prostate.  Valisure noted that this offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on numerous organs.

164.    The possible enzymatic reaction of ranitidine to DDAH-1, or other enzymes, suggests that high levels of NDMA can form throughout the human body.  Indeed, ranitidine metabolizes and circulates throughout the human body, crossing the placental and blood-brain barrier, within 1-2 hours.  When ranitidine interacts with the DDAH-1 enzyme in various organs throughout the body, it breaks down into NDMA.  This observation is validated by the Stanford study, discussed above.

**C.  Formation of NDMA by Exposure to Heat, Moisture, and/or Time**

165.    The risk of creating NDMA by exposing ranitidine to heat has been well-known and documented.  Early studies, including the one conducted by GSK in the early 1980s, demonstrated that nitrosamines were formed when ranitidine was exposed to heat.  This point was underscored in the Valisure petition, which initially used a high-heat testing method.

166.    In response to Valisure, on October 2, 2019, the FDA recommended that researchers use the LC-HRMS protocol for detecting NDMA in ranitidine because the "testing method does not use elevated temperatures" and has been proven capable of detecting NDMA.

167.    On January 2, 2020, Emery Pharma, an FDA-certified pharmaceutical testing laboratory, conducted a series of tests on ranitidine.  The researchers exposed ranitidine to 70 °C for varying periods of time.  The results showed that increasing levels of NDMA formed based on exposure to heat.  As reported by Emery Pharma, the following diagram reveals how NDMA accumulates over time when exposed to 70 °C:



**Figure 4 – Rate of Development of NDMA when Exposed to Heat**

168.    The researchers cautioned:

NDMA accumulates in ranitidine-containing drug products on exposure to elevated temperatures, which would be routinely reached during shipment and during storage.    More importantly, these conditions occur post-lot release by the manufacturer.  Hence, while NDMA levels in ranitidine may be acceptable at the source, they may not be so when the drug is purchased and subsequently at the time of consumption by the consumer.[105]

169.    The results of this data demonstrate that in normal transport and storage, and especially when exposed to heat or humidity, the ranitidine molecule systematically breaks down into NDMA, accumulating over time in the finished product.  Considering ranitidine-containing products have an approved shelf life of 36 months, the possibility of the drug accumulating dangerously high levels of NDMA before consumption is very real—a point underscored by the FDA's swift removal of the product from the market.

170.    In fact, the FDA acknowledged that testing revealed that NDMA levels in ranitidine

---

[105] Emery Pharma, *Emery Pharma Ranitidine: FDA Citizen Petition* (Jan. 2, 2020), *available at* https://emerypharma.com/news/emery-pharma-ranitidine-fda-citizen-petition/.

products stored at room temperature can increase with time to unacceptable levels.[106]

171.  In 2019, the findings by Valisure unleashed an avalanche of regulatory authorities throughout the world demanding that the manufacturers of Zantac and/or ranitidine conduct testing of their products for the presence of NDMA as well as investigate the root cause as to how NDMA was being generated.  In April 2020, the FDA requested that manufacturers immediately remove all ranitidine-containing products from the market.

172.  In the interim between the Valisure findings being released to the public and the FDA announcement requesting recall of all ranitidine products in April 2020, the manufacturers were investigating the root cause of NDMA in their products.

173.  After undertaking an investigation, GSK concluded that "the presence of NDMA in ranitidine drug substance is due to a slow degradation reaction occurring primarily in the solid state.  The two constituent parts of NDMA, the nitroso group and the dimethylamino group, are both derived from internal degradation reactions which occur at slow rates with the ranitidine molecule."[107]  Unsurprisingly, GSK came to the same conclusion as Valisure and Emery Pharma that "both temperature and relative humidity are significant factors impacting the actual rate of NDMA formation in drug substance."[108]  In addition, GSK's testing revealed NDMA in *all batches of drug product from all formulations tested* as well as varying levels of NDMA *in all historical batches of drug substance (API) from multiple manufacturers*.[109]

174.  Similarly, Sanofi also undertook testing and a root cause investigation.  Sanofi found high levels of NDMA in tested batches of ranitidine API and drug product and also

---

[106] Woodcock Letter, *supra* note 71.
[107] GSKZAN0000052019-GSKZAN0000052127.
[108] *Id*. p. 2.
[109] *Id*. p. 12.

concluded that "environmental conditions such as moisture, heat and light can impact the drug substance during the storage, handling and shipping."[110]

175.    Sanofi also engaged Uquifa, the company that supplied some of the ranitidine API that Sanofi used to manufacture its final Zantac and/or ranitidine products, to undertake a root cause analysis.  Uquifa determined that the root cause of NDMA in ranitidine API was "thermal sensitivity" and suggested that the storage temperature should be reduced to 2-8 degrees Celsius.[111]

176.    Defendants could dictate the conditions under which API was transported to them. The labeling requirements do not apply to transporting API, in part because the finished product and API are packaged differently and may degrade under different conditions.

177.    Based upon the documents produced by Defendants and based upon further information and belief, both the Defendants failed to ensure that their Ranitidine-Containing Products (in both API and finished dose form) were kept safely from excessive heat and humidity.[112]

## V.  EVIDENCE DIRECTLY LINKS RANITIDINE EXPOSURE TO CANCER

178.    In addition to numerous epidemiology studies examining how NDMA causes cancer in humans, researchers have also specifically looked at ranitidine and found an association with cancer.

---

[110] SANOFI_ZAN_MDL_0000151458.

[111] SANOFI_ZAN_MDL_0000166517-527, at p. 11.

[112] *See, e.g.,* BOE_ZAN_MDL_0000203482 ("Humidity monitoring during transport is not established as a mandatory process at BI."); GSKZAN0000178835 (GSK audit of a Dr. Reddy's facility found that there was "no evidence that the temperature and humidity in the cleanrooms are ensured to be within limits during the manufacture of ranitidine hcl for GSK Singapore….. the cleanroom limits for humidity are of particular importance for ranitidine hcl since product is known to be moisture sensitive.  Exposure to high humidity is a risk to product quality and usability."); DRLMDL0000087754 (notes that prior contracts with USPS to transport ranitidine to a Kentucky warehouse did not have policies requiring temperature during transport to be monitored); DRLMDL0000077957 (2012 EIR citing cGMP violations for storing raw materials in ambient temperatures up to 42 degrees Celsius in a warehouse).

45

179.    One epidemiology study, published in 2004, showed that men taking either ranitidine or cimetidine (Tagamet) had increased risks of bladder cancer.[113]

180.    In one epidemiology study specifically designed to look at breast cancer, ranitidine was shown to more than double the risk, an effect that was even more pronounced in those with specific gene mutations.[114]

181.    In another epidemiological study looking at various cancer risks and histamine $H_2$-receptor antagonists (or $H_2$ blockers), including ranitidine, the data showed that ranitidine consumption increased the risk of prostate, lung, esophageal, pancreatic, and kidney cancer.[115]  Of particular note, the study indicated that people under the age of 60 who took ranitidine were five times more likely to develop prostate cancer.  In addition, there was more than a doubling of the risk of pancreatic cancer with ranitidine use.

182.    A study published in 2018, demonstrated an increased risk of liver cancer associated with use of ranitidine in comparison with other $H_2$ blockers in the class.  The purpose of the study was to determine whether there was an increased risk of liver cancer associated with proton pump inhibitors, a different class of medications indicated for the treatment of GERD.  This finding is particularly notable as the authors adjusted for variables.[116]

183.    In 2018, a study found an increased risk in hepatocellular carcinoma associated

---

[113] D. Michaud et al., *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13 Cancer Epi. Biomarkers & Prevention 250–54 (Feb. 2004).

[114] Robert W. Mathes et al., *Relationship Between Histamine2-receptor Antagonist Medications and Risk of Invasive Breast Cancer*, 17 Cancer Epi. Biomarkers & Prevention 1, 67–72 (2008).

[115] Laurel A Habel et al., *Cimetidine Use and Risk of Breast, Prostate, and Other Cancers*, 9 Pharmacoepidemiology & Drug Safety 149–55 (2000).

[116] Kim Tu Tran et al., *Proton Pump Inhibitor and Histamine-2 receptor Antagonist Use and Risk of Liver Cancer in Two Population-based Studies*, 48 Alimentary Pharmacology & Therapeutics 1, 55–64 (2018).

with use of H[2] blockers.[117]   The authors were evaluating the risk of cancer in association with proton pump inhibitors and looked at H[2] blockers as a confounder.  The study only considered use of H[2] blockers within one year of cancer diagnosis and still found an increased odds ratio associated with use of H[2] blockers and hepatocellular carcinoma, a type of liver cancer.

184.    Several other studies have been published over the years showing an increased risk of various cancers associated with use of ranitidine and/or H[2] blockers.[118]  These cancers include breast, gastric, pancreatic, and stomach cancer.  Additional research reports that ranitidine use was associated with a spike in the risk of bladder, breast, colorectal/intestinal, esophageal, gastric, kidney, liver, lung, pancreatic, and prostate cancer.[119]

## VI. DEFENDANTS KNEW OR SHOULD HAVE KNOWN OF THE NDMA RISK

185.    As early as 1981, two years before Zantac entered the market, research showed elevated rates of NDMA, when properly tested.[120]  This was known or should have been known by the Defendants as the information was available in medical literature.

186.    In 1981, GSK, the originator of the ranitidine molecule, published a study focusing on the metabolites of ranitidine in urine using liquid chromatography.[121]  Many metabolites were

---

[117] Y-H J Shao et al., *Association Between Proton Pump Inhibitors and the Risk of Hepatocellular Carcinoma*, 48 Alimentary Pharmacology & Therapeutics 4, 460–68 (2018).

[118] Mathes et al., *supra* note 116; *see also* Jeong Soo Ahn et al., *Acid Suppressive Drugs and Gastric Cancer: A Meta-analysis of Observational Studies*, 19 World J. Gastroenterology 16, 2560 (2013); Shih-Wei Lai et al., *Use of Proton Pump Inhibitors Correlates with Increased Risk of Pancreatic Cancer: A Case-control Study in Taiwan*, 46 Kuwait Med. J. 1, 44–48 (2014); Poulsen et al., *Proton Pump Inhibitors and Risk of Gastric Cancer – A Population Based Cohort Study*, 100 Brit. J. Cancer 1503–07 (2009); E Wennerström, *Acid-suppressing Therapies and Subsite-specific Risk of Stomach Cancer*, 116 Brit. J. Cancer 9, 1234–38 (2017).

[119] Richard H. Adamson & Bruce A. Chabne, *The Finding of N-Nitrosodimethylamine in Common Medicines,* The Oncologist, June 2020; 25(6): 460–62, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7288647/.

[120] *See supra* ¶ 128 (discussing de Flora research).

[121] Carey et al., *Determination of Ranitidine and Its Metabolites in Human Urine by Reversed-phase Ion-pair High-performance Liquid Chromatography*, 255 J. Chromatography B: Biomedical Sci. & Appl. 1, 161–68 (1981).

listed, though nothing suggests that the study looked for NDMA.

187.    Indeed, in that same year, Dr. de Flora published a note discussing the results of his experiments showing that ranitidine was turning into mutagenic N-nitroso compounds, of which NDMA is one, in human gastric fluid when accompanied by nitrites—a substance commonly found in food and in the body.[122]  GSK was aware of this study because GSK specifically responded to the note and attempted to discredit it.  Defendants knew or should have known about this scientific exchange as it was published in a popular scientific journal.  Defendants were obligated to investigate this issue properly.  None did.

188.    By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds, GSK published a clinical study specifically investigating gastric contents in human patients and N-nitroso compounds.[123]  That study specifically stated that there were no elevated levels of N-nitroso compounds (of which NDMA is one).  But the study was flawed.  It used an analytical system called a "nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines.  Not only is that approach not accurate, but GSK also removed all gastric samples that contained ranitidine out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded."  Without the chemical being present in any sample, any degradation into NDMA could not, by design, be observed.  The inadequacy of that test was knowable in light of its scientific publication in 1987.  All Defendants either knew or should have known about the inadequacy of that study and should have investigated the issue properly and/or took action to protect consumers from the NDMA risks

---

[122] De Flora, *supra* note 69.
[123] Thomas et al., *supra* note 92.

in their products.  None did.

189.    Plaintiff references federal law herein not in any attempt to enforce it, but only to demonstrate that her state-law tort claims do not impose any extra obligations on Defendants, beyond what is already required of them under federal law.

## VII.    DEFENDANTS MADE FALSE STATEMENTS IN THE LABELING OF RANITIDINE-CONTAINING PRODUCTS

190.    A manufacturer is required to give adequate directions for the use of a pharmaceutical drug such that a "layman can use a drug safely and for the purposes for which it is intended,"[124] and conform to requirements governing the appearance of the label.[125]

191.    "Labeling" encompasses all written, printed or graphic material accompanying the drug or device,[126] and therefore broadly encompasses nearly every form of promotional activity, including not only "package inserts" but also advertising.

192.    "Most, if not all, labeling is advertising.  The term 'labeling' is defined in the FDCA as including all printed matter accompanying any article.  Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising."[127]

193.    All drug manufacturers are also responsible for conducting stability testing, which must be "designed to assess the stability characteristics of drug products."[128]  Manufacturers must adopt a written testing program that includes: "(1) Sample size and test intervals based on statistical criteria for each attribute examined to assure valid estimates of stability; (2) Storage conditions for samples retained for testing; (3) Reliable, meaningful, and specific test methods; (4) Testing of the drug product in the same container-closure system as that in which the drug product is marketed;

---

[124] 21 C.F.R. § 201.5.
[125] *Id.* § 201.15.
[126] *Id.*; 65 Fed. Reg. 14286 (Mar. 16, 2000).
[127] *United States v. Rsch. Labs.*, 126 F.2d 42, 45 (9th Cir. 1942).
[128] 21 C.F.R. § 211.166(a).

(5) Testing of drug products for reconstitution at the time of dispensing (as directed in the labeling) as well as after they are reconstituted."[129]

194. The purpose of stability testing is, in part, to determine the "appropriate storage conditions and expiration dates."[130] And expiration dates, in turn, must be set to "assure that a drug product meets applicable standards of identity, strength, quality, and purity at the time of use."[131] An expiration date is "related to any storage conditions stated on the labeling, as determined by stability studies listed in § 211.166."[132]

195. Each manufacturer must therefore conduct its own tests to determine and set accurate retest or expiration dates.

196. The FDA made clear when it first adopted the expiration-date provision that the regulation means what it says. The purpose of the expiration date is not merely to consider the "stability of a specific active ingredient." Instead, a compliant expiration date must account for multiple factors, including "the stability of the inactive ingredients, the interaction of active and inactive ingredients, the manufacturing process, the dosage form, the container closure system, the conditions under which the drug product is shipped, stored, and handled by wholesalers and retailers, and the length of time between initial manufacture and final use."[133]

197. The FDA expressly recognizes that an initial expiration date may not be the final expiration date: "Where data from accelerated studies are used to project a tentative expiration date that is beyond a date supported by actual shelf life studies, there must be stability studies conducted . . . until the tentative expiration date is verified or the appropriate expiration date

---

[129] *Id.*
[130] *Id.*
[131] *Id.* § 211.137(a).
[132] *Id.* § 211.137(b).
[133] 43 Fed. Reg. 45059 (Sept. 29, 1978).

determined."[134]

198.    After a drug is approved, a manufacturer can make changes to its drug application.  To do so, manufacturers must comply with the requirements of §§ 314.70 and 314.71.[135]

199.    Some of the requirements in those regulations require a manufacturer of an approved drug to obtain FDA approval before implementing a label change.[136]

200.    But the FDA has long recognized a "changes being effected" (CBE) supplement that permits a manufacturer to make immediate changes, subject to FDA's post-change review.[137]

201.    A manufacturer of an approved drug can use the CBE supplement to immediately make an "[a]ddition to a specification or changes in the methods or controls to provide increased assurance that the drug substance or drug product will have the characteristics of identity, strength quality, purity, or potency that it purports or is represented to possess."[138]  "A specification is defined as a list of tests, references to analytical procedures, and appropriate acceptance criteria that are numerical limits, ranges, or other criteria for the tests described."[139]

202.    A manufacturer, therefore, need not seek FDA pre-approval to make changes to its stability studies to identify the appropriate expiration date—which must "assure that a drug product meets applicable standards of identity, strength, quality, and purity at the time of use"[140]—or to ensure that the drug is shipped and stored under appropriate conditions.

203.    A manufacturer of an approved drug can also use the CBE supplement to make

---

[134] 21 C.F.R. § 211.166(b).
[135] *See id.* § 314.97(a) (requiring generics to comply with §§ 314.70, 314.71).
[136] *Id.* § 314.70(b).
[137] *Id.* § 314.70(c)(3), (c)(6).
[138] *Id.* § 314.70(c)(6)(i).
[139] 65 Fed. Reg. 83042 (Dec. 29, 2000).
[140] 21 C.F.R. § 211.137(a).

changes "in the labeling to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter"; "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product"; and "delete false, misleading, or unsupported indications for use or claims for effectiveness."[141]

204.    A manufacturer of an approved drug may make minor changes to a label with no approval or notice, so long as that change is described in an annual report.  The illustrative but non-exhaustive list of minor changes includes "[a] change in the labeling concerning the description of the drug product or in the information about how the drug product is supplied, that does not involve a change in the dosage strength or dosage form."[142]

205.    A "minor change" further includes "[a]n extension of an expiration dating period based upon full shelf life data on production batches obtained from a protocol approved in the NDA."[143]

206.    Not once did any Defendant attempt to include a warning on the labels for ranitidine-containing products that consumers were at elevated risk of developing cancer if the products were: (i) exposed to excessive heat; (ii) exposed to excessive moisture/humidity; (iii) consumed with high-nitrite foods; (iv) consumed daily for a period of greater than a few months. The FDA never rejected such cancer warnings.

207.    Not once did any Defendant attempt to change its label to delete a false or misleading expiration date, or to add a proper expiration date to ensure that ranitidine-containing

---

[141] *Id.* § 314.70(c)(6)(iii)(A), (C), (D).
[142] *Id.* § 314.70 (d)(2)(ix).
[143] *Id.* § 314.70 (d)(2)(vi); *see also id.* § 314.70(d)(2)(vii), (x).

products would not break down into NDMA before human consumption.

208.    Based on the public scientific information, the Defendants knew or should have known that NDMA could form in ranitidine by exposure to heat, humidity, nitrites, the conditions of the human stomach, and/or over time in storage.

209.    Not once did any Defendant change its label to shorten the expiration date. Defendants had the ability to unilaterally make such label changes (for both prescription and OTC) without prior FDA approval pursuant to the CBE regulation.  Had any Defendant attempted such label changes, the FDA would not have rejected them.

210.    Because they failed to include appropriate expiration dates on their products, Defendants made false statements in the labeling of their products.

## VIII.    FEDERAL LAW REQUIRED THE DEFENDANTS TO NOTIFY THE FDA ABOUT THE PRESENCE OF NDMA IN RANITIDINE-CONTAINING PRODUCTS

211.    While Defendants manufactured and sold ranitidine-containing products in the United States, the weight of scientific evidence showed that ranitidine exposed users to unsafe levels of NDMA.  Defendants failed to report these risks to the FDA.

212.    Defendants concealed the ranitidine–NDMA link from ordinary consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like ranitidine to the agency's attention.

213.    Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product.  The report is also required to contain a brief

description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

214.   21 C.F.R. § 314.81(b)(2)(v) provides that the manufacturer's annual report must also contain:

Copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (*e.g.*, mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product.

215.   Defendants ignored these regulations and, disregarding the scientific evidence available to them regarding the presence of NDMA in their products and the risks associated with NDMA, did not report to the FDA significant new information affecting the safety or labeling of ranitidine-containing products.

216.   Knowledge regarding the risk of NDMA in ranitidine was sufficiently available in the publicly available scientific literature such that any manufacturer, consistent with its heightened obligations to ensure the safety of its products, also should have known about the potential NDMA risks associated with ranitidine consumption.

217.   Defendants never conducted or provided the relevant studies to the FDA, nor did they present the FDA with a proposed disclosure noting the various ways that ranitidine transforms into NDMA.   Accordingly, because Defendants never properly disclosed the risks to the FDA, they never proposed any labeling or storage / transportation guidelines that would have addressed this risk.   Thus, the FDA was never able to reject any proposed warning or proposal for transport / storage.

218.   When the FDA eventually learned about the NDMA risks posed by ranitidine-containing products, it ordered manufacturers to voluntarily remove the products from the market. Thus, had any Defendant alerted the FDA to the risks of NDMA, the FDA would have required

54

the manufacturers to remove ranitidine-containing products from the market.

## IX. GOOD MANUFACTURING PRACTICES

219.     Under federal law, a manufacturer must manufacture, store, warehouse, and distribute pharmaceutical drugs in accordance with "Current Good Manufacturing Practices" (CGMPs) to ensure they meet safety, quality, purity, identity, and strength standards.[144]

220.     21 C.F.R. § 210.1(a) states that the CGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." Entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

221.     Pursuant to 21 C.F.R. § 211.142(b), the warehousing of drug products shall provide for "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products are not affected." In other words, Defendants had a duty and were obligated to properly store, handle, and warehouse ranitidine.

222.     Testing conducted by the FDA confirms that under accelerated conditions the elevated temperatures can lead to the presence of NDMA in the drug product.[145] FDA has also concluded that NDMA can increase in ranitidine under storage conditions allowed by the labels, and NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during normal distribution and handling. FDA's testing also showed that the level of NDMA in ranitidine-containing products increases

---

[144] 21 U.S.C. § 351(a)(2)(B).
[145] Woodcock Letter, *supra* note 71.

with time. And while Emery's Citizen Petition sought to obtain a directive regarding temperature-controlled shipping of ranitidine, which was necessary given the time and temperature sensitivity of the drug, that request was deemed moot by the FDA because the agency sought to withdraw ranitidine-containing products altogether.

223. Nothing prevented any Defendant from, on their own, taking actions to prevent accumulation of NDMA in ranitidine-containing products by ensuring that ranitidine was not exposed to heat or moisture over long periods.

## X. DECEDENT'S USE OF RANITIDINE-CONTAINING PRODUCTS

224. Decedent ingested ranitidine at various times as part of her treatment for gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal conditions.

225. Decedent used ranitidine-containing products designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants. Those products, unbeknownst to Decedent, transformed into dangerous levels of NDMA.

226. Decedent developed cancer, serious and/or permanent injuries, adverse effects, and/or death as set forth in this Complaint.

227. Decedent suffered significant bodily injuries, pain and suffering, mental anguish, disfigurement, embarrassment, inconvenience, loss of earnings and earning capacity and have and will incur past and future medical expenses as set forth in this Complaint or any other responsive discovery adduced in the respective constituent actions.

228. Based on prevailing scientific evidence, exposure to NDMA caused by consuming Defendants' ranitidine-containing products causes cancer in humans.

229. At all relevant times, Defendants knew or should have known that there was a significant increased risk of cancer associated with the transformation of ranitidine into NDMA, and death related to those diseases. Defendants continued to design, manufacture, test, market,

56

label, package, handle, distribute, store, and/or sell and profit from sales of ranitidine until it was withdrawn from the market.

230.    Defendants knowingly, purposely, and deliberately failed to warn Decedent, patients, consumers, medical providers, the FDA, and the public of the increased risk of serious injury associated with using ranitidine, and death related to those events.

231.    Decedent's prescribing physicians would not have prescribed ranitidine to Decedent, would have changed the way in which they treated Decedent's relevant conditions, changed the way they warned Decedent about the signs and symptoms of serious adverse effects of ranitidine, and discussed with Decedent the true risks of cancer, had Defendants provided said physicians with an appropriate and adequate warning regarding the risks associated with the use of ranitidine-containing products.

232.    Upon information and belief, Decedent's physicians were unaware of the increased risk of multiple types of cancer associated with the use of ranitidine due to its transformation into NDMA and, if they had been informed, would have used and prescribed alternative therapies to Decedent.

233.    Decedent would not have taken ranitidine had they known of or been fully and adequately informed by Defendants of the true increased risks and serious dangers of taking the drugs.

234.    As a direct and proximate result of Defendants' conduct, Decedent suffered serious and/or permanent injuries, adverse effects, and/or death as set forth in any responsive discovery adduced in the respective constituent actions, which resulted in damages to Plaintiff in sums in excess of $75,000.

235.    Defendants' conduct was committed with knowing, reckless, conscious, wanton,

57

willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages to punish and deter similar conduct in the future.

## TOLLING / FRAUDULENT CONCEALMENT

236.    Plaintiff asserts all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule and/or fraudulent concealment.

237.    The discovery rule applies to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts that Decedent had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

238.    The nature of Decedent's injuries, damages, or her causal relationship to Defendants' conduct was not discovered, and through reasonable care and due diligence could not have been discovered until a date within the applicable statute of limitations for filing Plaintiff's claims.

239.    Plaintiff brings this Complaint within the applicable statute of limitations. Specifically, Plaintiff brings this action within the prescribed time limits following Decedent's death and Plaintiff's knowledge of the wrongful cause. Before such time, Plaintiff did not know and had no reason to know of Decedent's injuries and/or the wrongful cause of those injuries.

240.    The running of the statute of limitations is tolled due to equitable tolling. Defendants are estopped from relying on any statutes of limitation or repose because of their acts of fraudulent concealment, through affirmative misrepresentations and omissions to Decedent and defects associated with ranitidine-containing products as they transform into NDMA.  Defendants

affirmatively withheld and/or misrepresented facts concerning the safety of ranitidine.  As a result of Defendants' misrepresentations and concealment, Decedent and Decedent's physicians were unaware, and could not have known or have learned through reasonable diligence, of facts related to Defendants' misrepresentations or omissions, that Decedent had been exposed to the risks alleged herein, or that those risks were the direct and proximate result of the wrongful acts and/or omissions of Defendants.

241.    Given Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the defects—information over which Defendants had exclusive control—and because Decedent could not reasonably have known that Defendants' ranitidine-containing products were and are defective, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise apply to the claims asserted herein.

## EXEMPLARY / PUNITIVE DAMAGES ALLEGATIONS

242.    Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice.  Defendants were fully aware of the safety risks of ranitidine, particularly the carcinogenic potential of ranitidine as it transforms into NDMA within the chemical environment of the human body and/or during transport and/or storage.  Yet, Defendants deliberately crafted their label and marketing to mislead consumers.

243.    This was not done by accident or through some justifiable negligence.  Rather, Defendants knew they could profit by convincing consumers that ranitidine was harmless to humans, and that full disclosure of the true risks of ranitidine would limit the amount of money Defendants would make selling the drugs.  Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, false advertising, and deceptive omissions as more fully alleged throughout this pleading.

59

Decedent was denied the right to make an informed decision about whether to purchase and use ranitidine-containing products, knowing the full risks attendant to that use.  Such conduct was done with conscious disregard of Decedent's rights.

244.   Accordingly, Plaintiff requests punitive damages (where available) against Defendants for the harms caused to Decedent.

## CAUSES OF ACTION

### COUNT I:  STRICT PRODUCTS LIABILITY—FAILURE TO WARN THROUGH WARNINGS AND PRECAUTIONS
#### (Against All Defendants)

245.   Plaintiff incorporates by reference each allegation set forth in paragraphs 20-29 (describing Defendants), 109–22 (describing the recall of ranitidine), 158–64 (describing the breakdown of ranitidine after ingestion), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendants' knowledge), and 224–35 (describing Decedent's use of ranitidine and injury), as if fully stated herein.

246.   The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products.  The relevant time periods are alleged in paragraphs 41–60, which are incorporated by reference.

247.   Ranitidine leads to NDMA exposure in the following ways: (1) the NDMA levels in ranitidine increase as the drug breaks down in the human digestive system and interacts with various enzymes in the human body; (2) the ranitidine molecule internally degrades to form NDMA, and the NDMA levels in the drug substance and the drug product increase over time under normal storage conditions, but more so with exposure to heat or humidity.

248.   NDMA is a potent carcinogen in humans.  Higher exposures to NDMA over longer time periods lead to even higher risks of cancer.

249.   To mitigate degradation of ranitidine into NDMA in the stomach, consumers should

have been warned not to take ranitidine with and after meals or in combination with a high-nitrite diet. No ranitidine-containing product contained this warning.

250. To mitigate degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers should have been warned to consume ranitidine shortly after manufacturing and to store it in a cool, dry place (e.g., not in a bathroom). No ranitidine-containing product contained this warning.

251. To mitigate the risk of NDMA causing cancer, consumers should have been warned to consume ranitidine for only short periods of time. No ranitidine-containing product warned that cancer could result from long-term ingestion of ranitidine.

252. Defendants knew or should have known about each of these risks in time to warn consumers.

253. As was alleged in more detail above, in 1981 Dr. Silvio de Flora published the results of experiments in The Lancet showing that ranitidine produced NDMA in combination with gastric fluid and nitrites. This study put all future manufacturers of ranitidine on notice of the risks of consuming ranitidine in combination with high-nitrite foods.

254. GSK responded in The Lancet in November 1981. This response shows that GSK was in fact aware of Dr. de Flora's research.

255. GSK told the FDA that Dr. de Flora's research has no "practical clinical significance."

256. GSK conducted another study around 1981 that found that ranitidine could cause nitrates to convert into nitrites in the human stomach, which, in combination with Dr. de Flora's research, would mean a heightened risk of NDMA formation. This should have sparked reconsideration of the claim that nitrites levels would not be high enough in the stomach for Dr.

de Flora's research to have practical significance.

257. In April 1982, GSK performed a study evaluating the formation of NDMA when ranitidine was exposed to nitrites (the Tanner Study). This study concerned the potential for ranitidine to break down into NDMA. Though other manufacturers may not have been aware of this study, any of them could have performed similar studies, and had the same reasons as GSK to be concerned.

258. After Zantac had been approved for marketing by the FDA, GSK conducted a study on how ranitidine breaks down in the human stomach and concluded that the amount of nitrosamines formed was low. It was published in 1987. However, GSK used a less reliable test (a nitrogen oxide assay) designed for use in food and discarded two-thirds of the samples because they contained ranitidine (which the study claimed might produce a false positive).

259. In 1983, after GSK's rigged study, but before it was published, a University of Genoa study determined that ranitidine could react with nitrite and produce NDMA, which could induce DNA damage.

260. Also in 1983, Dr. de Flora published his complete findings, confirming his initial results about the risks of NDMA breakdown in the human stomach in combination with nitrites. GSK did not modify its position.

261. In 2002, a study indicated that NDMA was found in the urine and gastric fluid of children after taking ranitidine for four weeks.

262. In 2012, a study indicated that ranitidine may be a source of NDMA in drinking water.

263. In 2016, a Stanford University study suggested that NDMA amounts in humans increased after consuming ranitidine.

62

264. In 2019, Valisure tested ranitidine tablets to determine whether they contained NDMA. Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA8 for the determination of NDMA levels. As per the FDA protocol developed for Valsartan, this method was validated to a lower limit of detection of 25 ng.[146] Valisure found when using the GC/MS headspace analysis method that ranitidine would transform into high levels of NDMA.

265. This testing by GC-MS demonstrates the instability of the ranitidine molecule and its propensity to break down under high temperatures.

266. Any Defendant could have studied ranitidine using the tests Valisure performed, and would have discovered that ranitidine transforms into NDMA when subjected to heat.

267. At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA. These actions were under the ultimate control and supervision of Defendants.

268. Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, sold, and/or otherwise released into the stream of commerce their ranitidine-containing products, and during the same, directly marketed the products to consumers and end users, including Decedent, and therefore had a duty to warn of the risks associated with the use of ranitidine.

269. At all relevant times, Defendants had a duty to properly manufacture, test, market,

---

[146] U.S. Food & Drug Admin., *Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, FY19-005-DPA-S* (Jan. 28, 2019).

63

label, package, handle, distribute, store, sell, provide proper warnings, and/or take such steps as necessary to ensure their ranitidine-containing products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Decedent of dangers associated with ranitidine. Defendants, as manufacturers and sellers of pharmaceutical medication, are held to the knowledge of an expert in the field.

270. Defendants had a continuing duty to provide appropriate and accurate warnings and precautions.

271. At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of ranitidine because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

272. At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

273. Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products. The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, but were not known to end users and consumers, such as Decedent.

274. Defendants knew or should have known that ranitidine-containing products created

64

significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users and her physicians of the risks of exposure to ranitidine-containing products. Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in ranitidine-containing products, and further, have made false and/or misleading statements concerning the safety of ranitidine.

275. Defendants possessed new information or new analyses of existing information that empowered them unilaterally to change the warnings and precautions section of their ranitidine-containing products' label.

276. Despite this ability, Defendants failed to warn of the risks of NDMA and their ranitidine-containing products in the warnings and precautions section of their ranitidine-containing products' label.

277. At all relevant times, the Ranitidine-Containing Products were defective at the time they left the Defendants' control. No extrinsic changes were made to alter the products Defendants manufactured. The warnings Decedent and her doctors observed were not changed from when they left Defendants' control.

278. Decedent was exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics.

279. At all relevant times, Decedent used and/or was exposed to the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

280. Decedent could not have reasonably discovered the defects and risks associated with ranitidine-containing products before or at the time Decedent consumed the drugs. Decedent

65

and her physicians relied on the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

281.   Defendants knew or should have known that the minimal warnings disseminated with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

282.   The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Decedent to avoid using the drug.  Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine; continued to aggressively promote the efficacy of ranitidine-containing products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting ranitidine.

283.   Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products on the warnings and precautions section of their products' labels, Decedent could have avoided the risk of developing injuries and could have obtained or used alternative medication.  However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Decedent was not alerted, and so could not avert her injuries.

284.   Defendants' conduct, as described above, was reckless.  Defendants risked the lives

66

of consumers and users of their products, including Decedent, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the public. Defendants made conscious decisions not to warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

285. Defendants' lack of adequate warnings and instructions in the warnings and precautions section of their ranitidine-containing products' labels were a substantial factor in causing Decedent's injuries.

286. As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Decedent has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

287. Plaintiff incorporates by reference each allegation set forth in paragraphs 245-86 as if fully stated herein.

288. Under Colorado law, a manufacturer has the duty to provide adequate warnings or instructions for use that adequately inform the user of any specific risk of harm that may be involved in any intended or reasonably expected use. A product is defective and unreasonably dangerous if it lacks an adequate warning.

289. Each Defendant breached this duty for the ranitidine containing-products it manufactured. The warnings included on each ranitidine-containing product were inadequate because they did not warn of the risk of cancer when taken over long periods, when stored under humid conditions, when stored under hot conditions, when consumed with a high-nitrite diet, and when consumed long after manufacture.

290. Decedent or her doctors would have read and heeded these warnings. As a result, Decedent would not have consumed the volume of NDMA they ultimately did, and would not have been harmed by NDMA.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II: NEGLIGENCE—FAILURE TO WARN THROUGH WARNINGS AND PRECAUTIONS
### (Against All Defendants)

291. Plaintiff incorporates by reference each allegation set forth in paragraphs 20–29 (describing Defendants), 109–22 (describing the recall of ranitidine), 158–64 (describing the breakdown of ranitidine after ingestion), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendant's knowledge), and 224–35 (describing Decedent's use of ranitidine and injury), as if fully stated herein. The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products. The relevant time periods are alleged in paragraphs 41–60, which are incorporated by reference.

292. Ranitidine leads to NDMA exposure in the following ways: (1) the NDMA levels in ranitidine increase as the drug breaks down in the human digestive system and interacts with various enzymes in the human body; (2) the ranitidine molecule internally degrades to form NDMA, and the NDMA levels in the drug substance and the drug product increase over time under normal storage conditions, but more so with exposure to heat or humidity.

293. NDMA is a potent carcinogen in humans. Higher exposures to NDMA over longer time periods lead to even higher risks of cancer.

68

294.     To mitigate degradation of ranitidine into NDMA in the stomach, consumers should have been warned not to take ranitidine with or after meals or in combination with a high-nitrite diet.  No ranitidine-containing product contained this warning.

295.     To mitigate degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers could be warned to consume ranitidine shortly after manufacturing and to store it in a cool, dry place (e.g., not in a bathroom).  No ranitidine-containing product contained this warning.

296.     To mitigate the risk of NDMA causing cancer, consumers should have been warned to consume ranitidine for only short periods of time.  No ranitidine-containing product warned that cancer could result from long-term ingestion of ranitidine.

297.     Defendants knew or should have known about each of these risks in time to warn consumers.

298.     As was alleged in more detail above, in 1981 Dr. Silvio de Flora published the results of experiments in The Lancet showing that ranitidine produced NDMA in combination with gastric fluid and nitrites.  This study put all future manufacturers of ranitidine on notice of the risks of consuming ranitidine in combination with high-nitrite foods.

299.     GSK responded in The Lancet in November 1981.  This response shows that GSK was in fact aware of Dr. de Flora's research.

300.     GSK told the FDA that Dr. de Flora's research has no "practical clinical significance."

301.     GSK conducted another study around 1981 that found that ranitidine could cause nitrates to convert into nitrites in the human stomach, which, in combination with Dr. de Flora's research, would mean a heightened risk of NDMA formation.  This should have sparked

69

reconsideration of the claim that nitrites would not be high enough in the stomach for Dr. de Flora's research to have practical significance.

302.   In April 1982, GSK performed a study evaluating the formation of NDMA when ranitidine was exposed to nitrites (the Tanner Study).  This study concerned the potential for ranitidine to break down into NDMA.  Though other manufacturers may not have been aware of this study, any of them could have performed similar studies, and had the same reasons as GSK to be concerned.

303.   After Zantac had been approved for marketing by the FDA, GSK conducted a study on how ranitidine breaks down in the human stomach, and concluded that the amount of nitrosamines formed was low.  That study was published in 1987.  However, GSK used a less reliable test (a nitrogen oxide assay) designed for use in food and discarded two-thirds of the samples because they contained ranitidine (which the study claimed might produce a false positive).

304.   In 1983, after GSK's rigged study, but before it was published, a University of Genoa study determined that ranitidine could react with nitrite and produce NDMA, which could induce DNA damage.

305.   Also in 1983, Dr. de Flora published his complete findings, confirming his initial results about the risks of NDMA breakdown in the human stomach in combination with nitrites. GSK did not modify its position.

306.   In 2002, a study indicated that NDMA was found in the urine and gastric fluid of children after taking ranitidine for four weeks.

307.   In 2012, a study indicated that ranitidine may be a source of NDMA in drinking water.

308. In 2016, a Stanford University study suggested that NDMA amounts in humans increased after consuming ranitidine.

309. In 2019, Valisure tested ranitidine tablets to determine whether they contained NDMA. Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA8 for the determination of NDMA levels. Valisure found when using the GC/MS headspace analysis method that ranitidine would transform into high levels of NDMA.

310. At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA. These actions were under the ultimate control and supervision of Defendants.

311. At all relevant times, Defendants had a duty to properly manufacture, test, market, label, package, handle, distribute, store, sell, provide proper warnings, and/or take such steps as necessary to ensure their ranitidine-containing products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Decedent of dangers associated with ranitidine. Defendants, as manufacturers and sellers of pharmaceutical medication, are held to the knowledge of an expert in the field.

312. Defendants had a continuing duty to provide appropriate and accurate warnings and precautions.

313. At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of ranitidine because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such

71

products.

314. At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

315. Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products. The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, but were not known to end users and consumers, such as Decedent.

316. Defendants knew or should have known that ranitidine-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users, and physicians of the risks of exposure to ranitidine-containing products. Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in ranitidine-containing products, and further, have made false and/or misleading statements concerning the safety of ranitidine.

317. Defendants possessed new information or new analyses of existing information that empowered them unilaterally to change the warnings and precautions section of their ranitidine-containing products' label.

318. Despite this ability, Defendants failed to warn of the risks of NDMA and their

72

ranitidine-containing products in the warnings and precautions section of their ranitidine-containing products' label.

319. At all relevant times, the Ranitidine-Containing Products were defective at the time they left the Defendants' control. No extrinsic changes were made to alter the products Defendants manufactured. The warnings Decedent and her doctors observed were not changed from when they left Defendants' control.

320. Decedent was exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics.

321. At all relevant times, Decedent used and/or was exposed to the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

322. Decedent could not have reasonably discovered the defects and risks associated with ranitidine-containing products before or at the time Decedent consumed the drugs. Decedent and her physicians relied on the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

323. Defendants knew or should have known that the minimal warnings disseminated with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

324. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Decedent to avoid using the drug. Instead, Defendants disseminated information that was inaccurate, false,

73

and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine; continued to aggressively promote the efficacy of ranitidine-containing products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting ranitidine.

325. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products on the warnings and precautions section of their products' labels, Decedent could have avoided the risk of developing injuries and could have obtained or used alternative medication. However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Decedent was not alerted, and so could not avert her injuries.

326. Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Decedent, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the public. Defendants made conscious decisions not to warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

327. Defendants' lack of adequate warnings and instructions in the warnings and precautions section of their ranitidine-containing products' labels were a substantial factor in causing Decedent's injuries.

328. As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Decedent has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and

74

damages including, but not limited to past and future medical expenses, lost income, and other damages.

329.    Plaintiff incorporates by reference each allegation set forth in paragraphs 291-328 as if fully stated herein.

330.    Under Colorado law, a manufacturer has a duty of reasonable care to provide adequate warnings or instructions for use that adequately inform the user of any specific risk of harm that may be involved in any intended or reasonably expected use.

331.    Each Defendant breached this duty for the ranitidine containing-products it manufactured.  The warnings included on each ranitidine-containing product were unreasonably inadequate because they did not warn of the risk of cancer when taken over long periods, when stored under humid conditions, when stored under hot conditions, when consumed with a high-nitrite diet, and when consumed long after manufacture.

332.    Decedent or her doctors would have read and heeded these warnings.  As a result, Decedent would not have consumed the volume of NDMA they ultimately did, and would not have been harmed by NDMA.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT III:  STRICT PRODUCTS LIABILITY—FAILURE TO WARN THROUGH PROPER EXPIRATION DATES
#### (Against All Defendants)

333.    Plaintiff incorporates by reference each allegation set forth in paragraphs 20–29 (describing Defendants).

334.    The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products.  The relevant time periods are

alleged in paragraphs 41–60 (for Defendants), which are incorporated by reference.

335.   Plaintiff incorporates by reference each allegation set forth in paragraphs 109–22 (describing the recall of ranitidine), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendant's knowledge), 224–35 (describing Decedent's use of ranitidine and injury), and 189–210 (describing the regulatory framework for drug manufacturers) as if fully stated herein.

336.   Ranitidine leads to NDMA exposure in the following ways: (1) the NDMA levels in ranitidine increase as the drug breaks down in the human digestive system and interacts with various enzymes in the human body; (2) the ranitidine molecule internally degrades to form NDMA, and the NDMA levels in the drug substance and the drug product increase over time under normal storage conditions, but more so with exposure to heat or humidity.

337.   NDMA is a potent carcinogen in humans.  Higher exposures to NDMA over longer time periods lead to even higher risks of cancer.

338.   To mitigate degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers could be warned to consume ranitidine shortly after manufacturing. No ranitidine-containing product contained this warning.

339.   In fact, ranitidine-containing products had expiration dating periods of one or two years, allowing accumulation of more and more unsafe levels of NDMA.  A much shorter period of a matter of months would have ensured that ranitidine contained far lower levels of NDMA when consumed.

340.   Defendants knew or should have known about each of these risks.  Simple, widely available and cost-effective tests reveal these risks.

341.   In setting the expiration and/or retest dates for her ranitidine-containing drugs,

76

Defendants were also required to base those dates on stability testing, which in turn must account for storage conditions.  21 C.F.R. § 211.166.

342.    Storage conditions must account for conditions, including the storage container, heat, light, and humidity, among other things.

343.    At all relevant times, the Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA.  These actions were under the ultimate control and supervision of Defendants.

344.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

345.    Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products.  The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, but were not known to end users and consumers, such as Decedent.

346.    Defendants knew or should have known that ranitidine-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users, and/or physicians of

77

the risks of exposure to ranitidine-containing products. Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in ranitidine-containing products, and further, have made false and/or misleading statements concerning the safety of ranitidine.

347. At all relevant times, the Ranitidine-Containing Products were defective at the time they left the Defendants' control. No extrinsic changes were made to alter the products Defendants manufactured. The expiration date Decedent observed was not changed from when they left Defendants' control.

348. Decedent was exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics.

349. At all relevant times, Decedent used and/or was exposed to the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

350. Decedent could not have reasonably discovered the defects and risks associated with ranitidine-containing products before or at the time Decedent consumed the drugs. Decedent and her physicians relied on the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

351. Defendants knew or should have known that the expiration dating periods disseminated with their ranitidine-containing products were inadequate because they were long enough for dangerous levels of NDMA to build up in ranitidine.

352. This alleged failure to warn is not limited to the information contained on the section of the ranitidine-containing products' label devoted to health warnings. Defendants were able, in accord with federal law, to comply with relevant state law by providing a short expiration

78

dating period that would accurately warn consumers not to consume ranitidine after significant portions of it had progressively deteriorated into NDMA. But Defendants did not disclose these known risks through any medium.

353. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products, Decedent could have avoided the risk of developing injuries and could have obtained or used alternative medication. However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Decedent was not alerted, and so could not avert her injuries.

354. Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Decedent, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

355. Defendants' lack of adequate warnings and instructions accompanying their ranitidine-containing products were a substantial factor in causing Decedent's injuries.

356. As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Decedent has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

357. Plaintiff incorporates by reference each allegation set forth in paragraphs 333-56 as if fully stated herein.

358. Under Colorado law, a manufacturer has the duty to provide adequate warnings or

instructions for use that adequately inform the user of any specific risk of harm that may be involved in any intended or reasonably expected use. A product is defective and unreasonably dangerous if it lacks an adequate warning.

359. Each Defendant breached this duty for the ranitidine containing-products it manufactured. The warnings included on each ranitidine-containing product were inadequate because the expiration date improperly instructed Decedent that ranitidine-containing products were safe when consumed long after manufacture, when in fact the products degraded into NDMA over time.

360. Decedent or her doctors would have read and heeded these warnings. As a result, Decedent would not have consumed the volume of NDMA they ultimately did, and would not have been harmed by NDMA.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV: NEGLIGENCE—FAILURE TO WARN THROUGH PROPER EXPIRATION DATES
### (Against All Defendants)

361. Plaintiff incorporates by reference each allegation set forth in paragraphs 20–29 (describing Defendants).

362. The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products. The relevant time periods are alleged in paragraphs 41–60 (for Defendants), which are incorporated by reference.

363. Plaintiff incorporates by reference each allegation set forth in paragraphs 109–22 (describing the recall of ranitidine), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendant's knowledge), 189–210 (describing the regulatory

80

framework for drug manufacturers), and 224–35 (describing Decedent's use of ranitidine and injury) as if fully stated herein.

364. Ranitidine leads to NDMA exposure in the following ways: (1) the NDMA levels in ranitidine increase as the drug breaks down in the human digestive system and interacts with various enzymes in the human body; (2) the ranitidine molecule internally degrades to form NDMA, and the NDMA levels in the drug substance and the drug product increase over time under normal storage conditions, but more so with exposure to heat or humidity.

365. NDMA is a potent carcinogen in humans. Higher exposures to NDMA over longer time periods lead to even higher risks of cancer.

366. To mitigate degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers could be warned to consume ranitidine shortly after manufacturing. No ranitidine-containing product contained this warning.

367. In fact, ranitidine-containing products had expiration dating periods of one or two years, allowing gradual accumulation of more and more NDMA. A much shorter period of a matter of months would have ensured that ranitidine contained far lower levels of NDMA when consumed.

368. Defendants knew or should have known about each of these risks in time to warn consumers. Simple, widely available and cost-effective tests reveal these risks.

369. In setting the expiration and/or retest dates for their ranitidine-containing drugs, Defendants were also required to base those dates on stability testing, which in turn must account for storage conditions. 21 C.F.R. § 211.166.

370. Storage conditions must account for conditions, including the storage container, heat, light, and humidity, among other things.

371.    At all relevant times, each Defendant failed to adhere to their duties to set accurate expiration dates based upon stability testing that complied with the manufacturers' duties to account for these real-world conditions.  These actions were under the ultimate control and supervision of Defendants.

372.    Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA.

373.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

374.    Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products.  The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, but were not known to end users and consumers, such as Decedent.

375.    Defendants knew or should have known that ranitidine-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users, and/or physicians of the risks of exposure to ranitidine-containing products.  Defendants failed to warn and have

82

wrongfully concealed information concerning the dangerous level of NDMA in ranitidine-containing products, and further, have made false and/or misleading statements concerning the safety of ranitidine.

376.    At all relevant times, the Ranitidine-Containing Products were defective at the time they left the Defendants' control.  No extrinsic changes were made to alter the products Defendants manufactured.  The expiration dates Decedent and her doctors observed were not changed from when they left Defendants' control.

377.    Decedent was exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics.

378.    At all relevant times, Decedent used and/or was exposed to the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

379.    Decedent could not have reasonably discovered the defects and risks associated with ranitidine-containing products before or at the time Decedent consumed the drugs.  Decedent and her physicians relied on the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

380.    Defendants knew or should have known that the expiration dating periods disseminated with their ranitidine-containing products were inadequate because they were long enough for dangerous levels of NDMA to build up in ranitidine.

381.    This alleged failure to warn is not limited to the information contained on the section of the ranitidine-containing products' label devoted to health warnings.  Defendants were able, in accord with federal law, to comply with relevant state law by providing a short expiration dating period that would accurately warn consumers not to consume ranitidine after significant

portions of it had progressively deteriorated into NDMA.  But Defendants did not disclose these known risks through any medium.

382.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products, Decedent could have avoided the risk of developing injuries and could have obtained or used alternative medication.  However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Decedent was not alerted, and so could not avert her injuries.

383.    Defendants' conduct, as described above, was reckless.  Defendants risked the lives of consumers and users of their products, including Decedent, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the public.  Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public.  Defendants' reckless conduct warrants an award of punitive damages.

384.    Defendants' lack of adequate warnings and instructions accompanying their ranitidine-containing products were a substantial factor in causing Decedent's injuries.

385.    As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Decedent has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

386.    Plaintiff incorporates by reference each allegation set forth in paragraphs 361-85 as if fully stated herein.

387.    Under Colorado law, a manufacturer has a duty of reasonable care to provide adequate warnings or instructions for use that adequately inform the user of any specific risk of

harm that may be involved in any intended or reasonably expected use.

388.    Each Defendant breached this duty for the ranitidine containing-products it manufactured.  The expiration date improperly instructed Decedent that ranitidine-containing products were safe when consumed long after manufacture, when in fact the products degraded into NDMA over time.

389.    Decedent or her doctors would have read and heeded these warnings.  As a result, Decedent would not have consumed the volume of NDMA they ultimately did, and would not have been harmed by NDMA.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V:  FAILURE TO WARN THE CONSUMERS THROUGH THE FDA
### (Against All Defendants)

390.    Plaintiff incorporates by reference each allegation set forth in paragraphs 20–29 (describing Defendants) and 127–57 (describing the breakdown of NDMA after ingestion).

391.    The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products.  The relevant time periods are alleged in paragraphs 41–60 (for Defendants), which are incorporated by reference.

392.    Plaintiff incorporates by reference each allegation set forth in paragraphs 109–22 (describing the recall of ranitidine), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendant's knowledge), 189–210 (describing the regulatory framework for drug manufacturers), 211–18 (describing the FDA's reporting requirements), and 224–35 (describing Decedent's use of ranitidine and injury) as if fully stated herein.

393.    At all relevant times, Defendants designed, manufactured, tested, marketed,

labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Decedent. These actions were under the ultimate control and supervision of Defendants.

394. Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, sold, and/or otherwise released into the stream of commerce their ranitidine-containing products, and during the same, directly marketed the products to consumers and end users, including Decedent, and therefore had a duty to warn of the risks associated with the use of ranitidine.

395. Defendants had a duty to warn Decedent of dangers associated with ranitidine.

396. At the time of manufacture and at other times before the ingestion of ranitidine, Defendants could have provided the warnings or instructions regarding ranitidine's risk of cancer because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

397. Defendants, as manufacturers and sellers of pharmaceutical medication, are held to the knowledge of an expert in the field.

398. At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

399. Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products. The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were

86

known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, but were not known to end users and consumers, such as Decedent.

400. At all relevant times, Defendants' ranitidine-containing products were expected to and did reach Decedent without a substantial change in their anticipated or expected design as manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by the Defendants.

401. Decedent was exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics. Decedent could not have reasonably discovered the defects and risks associated with ranitidine-containing products before or at the time Decedent consumed the drugs. Decedent and her physicians relied on the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

402. At all relevant times, Decedent used and/or was exposed to the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

403. Defendants knew or should have known that the minimal warnings disseminated with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

404. The information that Defendants did provide or communicate failed to contain relevant warnings, expiration dates, hazards, and precautions that would have enabled consumers

87

such as Decedent to avoid using the drug.  Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine; continued to aggressively promote the efficacy of ranitidine-containing products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting ranitidine.

405.    This alleged failure to warn is not limited to the information contained on ranitidine-containing products' labeling.  Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with ranitidine to the FDA.

406.    Defendants are required under federal law to submit adverse event reports.  See 21 C.F.R. § 314.80.  These requirements place an affirmative obligation on manufacturers to seek information about their products.  Every manufacturer "must promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from commercial marketing experience, postmarketing clinical investigations, postmarketing epidemiological/surveillance studies, reports in the scientific literature, and unpublished scientific papers. … Any person subject to the reporting requirements under paragraph (c) of this section must also develop written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences to FDA." 21 C.F.R. § 314.80(b). Each Defendant systematically failed to submit adverse event reports about the cancer risks of ranitidine.  Each Defendant failed to put in place procedures ensuring full compliance with their reporting obligations.

407.     According to the FDA's Adverse Events Reporting System (FAERS) with data up to September 2020, 59% of all-time adverse events for branded and generic ranitidine were filed in 2020.  Before 2019, the volume of adverse events reported for ranitidine-containing products that mentioned cancer as a reaction was insignificant.

408.     Defendants may, consistent with federal law, inform the FDA of new analyses of data, newly revealed risks, new testing, or other information about their drugs.

409.     Upon information and belief, at all relevant times, Defendants failed to adhere to their pharmacovigilance obligations to collect, analyze, and report adverse events to consumers and physicians through the FDA.

410.     Defendants, by failing to adequately warn of the risk of NDMA, failed to provide physicians and consumers (like Decedent) with sufficient information for them to know enough to report adverse events when they occurred.

411.     The failure by the Defendants to sufficiently report adverse events to the FDA prevented physicians and researchers from having access to accurate information about the true risks of Zantac and ranitidine.

412.     Physicians can and did conduct studies about the risks of Zantac and ranitidine based on the data available through the FAERS.  Had the Defendants adequately warned the FDA by putting in place sufficient pharmacovigilance programs and adequate warnings, physicians conducting studies would have been able to better ascertain, report, and publish literature on the true risks associated with ingesting Zantac and ranitidine.

413.     Nonetheless, Defendants failed to inform the FDA of the risks of ranitidine breaking down into carcinogenic NDMA.

414.     When the FDA was told of the risks of ranitidine in 2019, it promptly posted notices

89

on its website, investigated the issue, and ordered a recall. The broader medical community became aware of, and reacted to, the cancer risks of ranitidine.

415. Had Defendants submitted adverse event reports concerning ranitidine's cancer risks or otherwise informed the FDA of those risks years earlier, the FDA would have acted similarly by publicizing and investigating the concerns, and, ultimately, ordering a recall. The medical community would also have been promptly aware of the risks. Decedent's doctors would not have prescribed ranitidine in light of those risks and the availability of safe substitutes. Similarly, Decedent would not have purchased and ingested ranitidine.

416. Had Defendants submitted adverse event reports concerning ranitidine's cancer risks or otherwise informed the FDA of those risks years earlier, Decedent could have avoided the risk of developing injuries and could have obtained or used alternative medication.

417. However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Decedent could not have averted her injuries.

418. Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Decedent, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the public and the FDA.

419. Defendants made conscious decisions not to warn or inform the unsuspecting public or FDA, though they could have done so. Defendants' reckless conduct warrants an award of punitive damages.

420. Defendants' failure to provide adequate warnings and instructions accompanying their ranitidine-containing products were a substantial factor in causing Decedent's injuries.

421. As a direct and proximate result of Defendants' failure to provide an adequate

90

warning of the risks of ranitidine-containing products, Decedent has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

### COUNT VI:  STRICT PRODUCTS LIABILITY—DESIGN DEFECT DUE TO WARNINGS AND PRECAUTIONS
### (Against All Defendants)

422.   Plaintiff incorporates by reference each allegation set forth in paragraphs 20–29 (describing Defendants), 109–22 (describing the recall of ranitidine), 158–64 (describing the breakdown of ranitidine after ingestion), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendant's knowledge), and 224–35 (describing Decedent's use of ranitidine and injury), as if fully stated herein.

423.   The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products.  The relevant time periods are alleged in paragraphs 41–60, which are incorporated by reference.

424.   Ranitidine leads to NDMA exposure in the following ways: (1) the NDMA levels in ranitidine increase as the drug breaks down in the human digestive system and interacts with various enzymes in the human body; (2) the ranitidine molecule internally degrades to form NDMA, and the NDMA levels in the drug substance and the drug product increase over time under normal storage conditions, but more so with exposure to heat or humidity.

425.   NDMA is a potent carcinogen in humans.  Higher exposures to NDMA over longer time periods lead to even higher risks of cancer.

426.   To mitigate degradation of ranitidine into NDMA in the stomach, consumers could be warned not to take ranitidine after meals or in combination with a high-nitrite diet.  No ranitidine-containing product contained this warning.

91

427.    To mitigate degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers could be warned to consume ranitidine shortly after manufacturing and to store it in a cool, dry place (not in a bathroom).  No ranitidine-containing product contained this warning.

428.    To mitigate the risk of NDMA causing cancer, consumers could be warned to consume ranitidine for only short periods of time.  No ranitidine-containing product warned that cancer could result from long-term ingestion of high amounts of ranitidine.

429.    Defendants knew or should have known about each of these risks in time to warn consumers.

430.    As was alleged in more detail above, in 1981 Dr. Silvio de Flora published the results of experiments in The Lancet showing that ranitidine produced NDMA in combination with gastric fluid and nitrites.  This study put all future manufacturers of ranitidine on notice of the risks of consuming ranitidine in combination with high-nitrite foods.

431.    GSK responded in The Lancet in November 1981.  This response shows that GSK was in fact aware of Dr. de Flora's research.

432.    GSK told the FDA that Dr. de Flora's research has no "practical clinical significance."

433.    GSK conducted another study around 1981 that found that ranitidine could cause nitrates to convert into nitrites in the human stomach, which, in combination with Dr. de Flora's research, would mean a heightened risk of NDMA formation.  This should have sparked reconsideration of the claim that nitrites would not be high enough in the stomach for Dr. de Flora's research to have practical significance.

434.    In April 1982, GSK performed an NDMA test on ranitidine (the Tanner Study).

92

This study was never published.  This study shows that GSK knew far more than it disclosed to the FDA at the time, and was concerned with the potential for ranitidine to break down into NDMA.  Though other manufacturers may not have been aware of this study, any of them could have performed similar studies, and had the same reasons as GSK to be concerned.

435.    After Zantac had been approved for marketing by the FDA, GSK conducted a study on how ranitidine breaks down in the human stomach, and concluded that the amount of NDMA formed was low.  It published that study in 1987.  However, GSK used a less reliable test (a nitrogen oxide assay) designed for use in food and discarded two-thirds of the samples because they contained ranitidine (which the study claimed might produce a false positive).

436.    In 1983, after GSK's rigged study, but before it was published, a University of Genoa study determined that ranitidine could react with nitrite and produce NDMA, which could induce DNA damage.

437.    Also in 1983, Dr. de Flora published his complete findings, confirming his initial results about the risks of NDMA breakdown in the human stomach in combination with nitrites. GSK did not modify its position.

438.    In 2012, a study indicated that ranitidine may be a source of NDMA in drinking water.

439.    In 2016, a Stanford University study suggested that NDMA amounts in humans increased after consuming ranitidine.

440.    In 2019, Valisure tested ranitidine tablets to determine whether they contained NDMA.  Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA8 for the determination of NDMA levels. Valisure found when using the GC/MS headspace analysis method that ranitidine would transform into high levels of

93

NDMA.

441. At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA. These actions were under the ultimate control and supervision of Defendants.

442. Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, sold, and/or otherwise released into the stream of commerce their ranitidine-containing products, and during the same, directly marketed the products to consumers and end users, including Decedent, and therefore had a duty to warn of the risks associated with the use of ranitidine.

443. At all relevant times, Defendants had a duty to properly manufacture, test, market, label, package, handle, distribute, store, sell, provide proper warnings, and/or take such steps as necessary to ensure their ranitidine-containing products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Decedent of dangers associated with ranitidine. Defendants, as manufacturers and sellers of pharmaceutical medication, are held to the knowledge of an expert in the field.

444. Defendants had a continuing duty to provide appropriate and accurate warnings and precautions.

445. At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of ranitidine because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

94

446. At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

447. Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products. The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, but were not known to end users and consumers, such as Decedent.

448. Defendants knew or should have known that ranitidine-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users, and physicians of the risks of exposure to ranitidine-containing products. Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in ranitidine-containing products, and further, have made false and/or misleading statements concerning the safety of ranitidine.

449. Defendants possessed new information or new analyses of existing information that empowered them unilaterally to change the warnings and precautions section of their ranitidine-containing products' label.

450. Despite this ability, Defendants failed to warn of the risks of NDMA and their ranitidine-containing products in the warnings and precautions section of their ranitidine-

95

containing products' label.

451.    At all relevant times, the Ranitidine-Containing Products were defective at the time they left the Defendants' control.  No extrinsic changes were made to alter the products Defendants manufactured.  The warnings Decedent and her doctors observed were not changed from when they left Defendants' control.

452.    Decedent was exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics.

453.    At all relevant times, Decedent used and/or was exposed to the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

454.    Decedent could not have reasonably discovered the defects and risks associated with ranitidine-containing products before or at the time Decedent consumed the drugs.  Decedent and her physicians relied on the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

455.    Defendants knew or should have known that the minimal warnings disseminated with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

456.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Decedent to avoid using the drug.  Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative

96

severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine; continued to aggressively promote the efficacy of ranitidine-containing products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting ranitidine.

457.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products on the warnings and precautions section of their products' labels, Decedent could have avoided the risk of developing injuries and could have obtained or used alternative medication.  However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Decedent could not have averted her injuries.

458.    Defendants' conduct, as described above, was reckless.  Defendants risked the lives of consumers and users of their products, including Decedent, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the public.  Defendants made conscious decisions not to warn or inform the unsuspecting public.  Defendants' reckless conduct warrants an award of punitive damages.

459.    Defendants' lack of adequate warnings and instructions in the warnings and precautions section of their ranitidine-containing products' labels were a substantial factor in causing Decedent's injuries.

460.    As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Decedent has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other

97

damages.

461.    Plaintiff incorporates by reference each allegation set forth in paragraphs 422-60 as if fully stated herein.

462.    Under Colorado law, a manufacturer has the duty to provide adequate warnings or instructions for use that adequately inform the user of any specific risk of harm that may be involved in any intended or reasonably expected use.  A product is defective and unreasonably dangerous if it lacks an adequate warning.

463.    Each Defendant breached this duty for the ranitidine containing-products it manufactured.  The warnings included on each ranitidine-containing product were inadequate because they did not warn of the risk of cancer when taken over long periods, when stored under humid conditions, when stored under hot conditions, when consumed with a high-nitrite diet, and when consumed long after manufacture.

464.    Decedent or her doctors would have read and heeded these warnings.  As a result, Decedent would not have consumed the volume of NDMA they ultimately did, and would not have been harmed by NDMA.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VII:  STRICT PRODUCTS LIABILITY—DESIGN DEFECT DUE TO IMPROPER EXPIRATION DATES
### (Against All Defendants)

465.    Plaintiff incorporates by reference each allegation set forth in paragraphs 20–29 (describing Defendants).

466.    The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products.  The relevant time periods are

alleged in paragraphs 41–60 (for Defendants), which are incorporated by reference.

467.    Plaintiff incorporates by reference each allegation set forth in paragraphs 109–22 (describing the recall of ranitidine), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendant's knowledge), 189–210 (describing the regulatory framework for drug manufacturers), and 224–35 (describing Decedent's use of ranitidine and injury) as if fully stated herein.

468.    Ranitidine leads to NDMA exposure in the following ways: (1) the NDMA levels in ranitidine increase as the drug breaks down in the human digestive system and interacts with various enzymes in the human body; (2) the ranitidine molecule internally degrades to form NDMA, and the NDMA levels in the drug substance and the drug product increase over time under normal storage conditions, but more so with exposure to heat or humidity.

469.    NDMA is a potent carcinogen in humans.  Higher exposures to NDMA over longer time periods lead to even higher risks of cancer.

470.    To mitigate degradation of ranitidine into NDMA over time, and in the presence of heat or humidity, consumers could be warned to consume ranitidine shortly after manufacturing. No ranitidine-containing product contained this warning.

471.    In fact, ranitidine-containing products had expiration dating periods of one or two years, allowing gradual accumulation of more and more NDMA.  A much shorter period of a matter of months would have ensured that ranitidine contained far lower levels of NDMA when consumed.

472.    Defendants knew or should have known about each of these risks in time to warn consumers.  Simple, widely available and cost-effective tests reveal these risks.

473.    In setting the expiration and/or retest dates for their ranitidine-containing drugs,

99

Defendants were also required to base those dates on stability testing, which in turn must account for storage conditions.  21 C.F.R. § 211.166.

474.   Storage conditions must account for conditions, including the storage container, heat, light, and humidity, among other things.

475.   At all relevant times, the Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA.  These actions were under the ultimate control and supervision of Defendants.

476.   At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

477.   Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products.  The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, but were not known to end users and consumers, such as Decedent.

478.   Defendants knew or should have known that ranitidine-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users, and/or physicians of

100

the risks of exposure to ranitidine-containing products. Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in ranitidine-containing products, and further, have made false and/or misleading statements concerning the safety of ranitidine.

479. At all relevant times, the Ranitidine-Containing Products were defective at the time they left the Defendants' control. No extrinsic changes were made to alter the products Defendants manufactured. The expiration dates Decedent and her doctors observed were not changed from when they left Defendants' control.

480. Decedent was exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics.

481. At all relevant times, Decedent used and/or was exposed to the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

482. Decedent could not have reasonably discovered the defects and risks associated with ranitidine-containing products before or at the time Decedent consumed the drugs. Decedent and her physicians relied on the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

483. Defendants knew or should have known that the expiration dating periods disseminated with their ranitidine-containing products were inadequate because they were long enough for dangerous levels of NDMA to build up in ranitidine.

484. This alleged failure to warn is not limited to the information contained on the section of the ranitidine-containing products' label devoted to health warnings. Defendants were able, in accord with federal law, to comply with relevant state law by providing a short expiration

dating period that would accurately warn consumers not to consume ranitidine after significant portions of it had progressively deteriorated into NDMA. But Defendants did not disclose these known risks through any medium.

485. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products, Decedent could have avoided the risk of developing injuries and could have obtained or used alternative medication. However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Decedent was not alerted, and so could not avert her injuries.

486. Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Decedent, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

487. Defendants' lack of adequate warnings and instructions accompanying their ranitidine-containing products were a substantial factor in causing Decedent's injuries.

488. As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Decedent has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

489. Plaintiff incorporates by reference each allegation set forth in paragraphs 465-88 as if fully stated herein.

490. Under Colorado law, a manufacturer has the duty to provide adequate warnings or

instructions for use that adequately inform the user of any specific risk of harm that may be involved in any intended or reasonably expected use. A product is defective and unreasonably dangerous if it lacks an adequate warning.

491. Each Defendant breached this duty for the ranitidine containing-products it manufactured. The warnings included on each ranitidine-containing product were inadequate because the expiration date improperly instructed Decedent that ranitidine-containing products were safe when consumed long after manufacture, when in fact the products degraded into NDMA over time.

492. Decedent or her doctors would have read and heeded these warnings. As a result, Decedent would not have consumed the volume of NDMA they ultimately did, and would not have been harmed by NDMA.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VIII:  NEGLIGENT FAILURE TO TEST
### (Against All Defendants)

493. Plaintiff incorporates by reference each allegation set forth in paragraphs 20–29 (describing Defendants) and 127–57 (describing the breakdown of NDMA after ingestion).

494. The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products. The relevant time periods are alleged in paragraphs 41–60 (for Defendants), which are incorporated by reference.

495. Plaintiff incorporates by reference each allegation set forth in paragraphs 109–22 (describing the recall of ranitidine), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendant's knowledge), 189–210 (describing the regulatory

framework for drug manufacturers), and 224–35 (describing Decedent's use of ranitidine and injury) as if fully stated herein.

496. Readily available testing methods revealed the dangers of Defendants' ranitidine-containing products. For example, gas chromatography-mass spectrometry, the technique Valisure employed in 2019 to identify NDMA forming in ranitidine, was a widely available, cost-effective, industry-standard testing method. If this testing method had been used by Defendants to test ranitidine, they could have determined that ranitidine transforms into NDMA when subjected to heat.

497. Upon information and belief, no Defendant tested the effects of temperature, time, humidity, light, or other relevant storage or transportation conditions on the quantity of NDMA in ranitidine-containing products.

498. Testing of the ranitidine molecule at any time would have revealed that hotter temperatures, longer time periods, and higher humidity each increases the amount of NDMA.

499. Testing of the ranitidine molecule at any time also would have revealed that the typical temperature, time period, and humidity that ranitidine-containing products were exposed to before being consumed resulted in dangerously high levels of NDMA.

500. Defendants knew or should have known that ranitidine-containing products posed a grave risk of harm. The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting ranitidine, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold the product, but were not known to end users and consumers, such as Decedent.

104

501.    For example, Defendants knew that ranitidine had an inherent risk of degrading into NDMA because it has both a nitroso (N) and dimethylamine (DMA), which are all the ingredients needed to form NDMA.

502.    Defendants also were on notice of the need to test and fully evaluate the carcinogenicity of ranitidine based on the research by Dr. de Flora and Dr. R.J.N. Tanner performed in the 1980s, which would have alerted the reasonable manufacturer of ranitidine to beware of the potential for NDMA to form in the drug and/or in the human body.

503.    Any of a variety of tests for NDMA would have sparked quick action.  The FDA initiated a voluntary recall only seven months after Valisure first publicized its NDMA testing results in September 2019.  If any Defendant had performed and publicized a similar test at an earlier time, the FDA and broader market would have acted as quickly and decisively as happened in 2019, since the dangerous properties of NDMA were widely understood at all relevant times.

504.    Defendants, directly or indirectly, manufactured, tested, and/or sold ranitidine-containing products that Decedent used.

505.    At all relevant times, Defendants had reason to know of the need for testing to reveal the hazards and dangers of ranitidine and, specifically, the carcinogenic properties of NDMA when ranitidine-containing products are ingested and/or the elevated levels of NDMA that occurs when ranitidine-containing products are transported and stored based on studies conducted in the 1980s.

506.    Defendants ignored this risk.  They did not use widely available tests to detect NDMA.

507.    Ignoring the risks of NDMA was unreasonable and reckless.  Indeed, Defendants deliberately refused to test ranitidine-containing products for NDMA levels because they knew

105

that the chemical posed serious health risks to humans.

508.    The Defendants' failure to test their ranitidine-containing products properly directly and proximately caused Decedent's harm.  That is because if Defendants had tested their ranitidine-containing products properly, the high levels of NDMA would have become public, which would have eliminated or reduced Decedent's exposure through several alternative routes:

- The FDA, as it did in 2019, would have performed its own testing and had ranitidine voluntarily recalled in less than a year.
- Other manufacturers and laboratories would have reproduced the tests and conducted novel tests to pinpoint the amount of NDMA in ranitidine.
- The medical community would have learned of the risks and stopped prescribing prescription ranitidine to Decedent and/or Decedent would have refused to take the drug if properly advised of the risks posed by the presence of NDMA.
- Even if the FDA did not recall the drug, Defendants would have added additional warnings in time for Decedent to avoid the use that caused Decedent's cancers (for example, requiring only short-term use; recommending a low-nitrite diet, or other changes); or would have made other changes to the label (such as requiring cold storage in low-humidity conditions).

509.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of ranitidine-containing products were unaware of the risks and the magnitude of the risks associated with use of ranitidine-containing products.

510.    Defendants—who designed, manufactured, tested (in other ways), marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine—were in a superior position to understand the risk of NDMA being present in and/or forming in ranitidine-containing products and had a duty to test for these dangers.

511.    Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants failed to do so.  Indeed, Defendants wrongfully concealed information and further made false and/or misleading statements concerning the safety and use of ranitidine-containing products.

512. Defendants knew or should have known that it was foreseeable that consumers such as Decedent would suffer injuries because Defendants failed to exercise ordinary care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products.

513. Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to ranitidine-containing products.

514. Defendants' negligence was a substantial factor in causing Decedent's injuries.

515. Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Decedent, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to test their ranitidine-containing products. Defendants' reckless conduct therefore warrants an award of punitive damages.

## COUNT IX: NEGLIGENT PRODUCT CONTAINERS
### (Against All Defendants)

516. Plaintiff incorporates by reference each allegation set forth in paragraphs 20–29 (describing Defendants).

517. The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products. The relevant time periods are alleged in paragraphs 41–60 (for Defendants), which are incorporated by reference.

518. Plaintiff incorporates by reference each allegation set forth in paragraphs 109–22 (describing the recall of ranitidine), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendant's knowledge), 189–210 (describing the regulatory framework for drug manufacturers), and 224–35 (describing Decedent's use of ranitidine and injury) as if fully stated herein.

107

519. As alleged above, each Defendant was required to conduct stability testing, which was required to take the container into account.

520. As previously alleged, ranitidine degrades into NDMA more quickly at higher temperatures, at higher humidity levels, and under other poor storage or handling conditions.

521. Defendants knew that ranitidine had an inherent risk of degrading into NDMA because it has both a nitroso (N) and dimethylamine (DMA), which are all the ingredients needed to form NDMA.

522. The ranitidine-containing products Decedent consumed had excessive levels of NDMA in part because they were subjected to high levels of humidity and were stored for an extended time (often in humid locations such as bathrooms).

523. A substantial factor in NDMA formation was the container system manufacturers chose. Pill bottles with large numbers of units of ranitidine are likely to be stored for long periods by consumers after the seal is broken. This exposes the remaining units to humidity over time, which produces NDMA.

524. A different container would have reduced the amount of NDMA Decedent consumed in several ways:

   a. Placing each unit of ranitidine in a blister pack or similar individually packaged container would ensure humidity control until the consumer used each unit.
   b. Reducing the number of units of ranitidine in each bottle to a low number would ensure the unused units were subject to humidity for only a shorter time period, since consumers would purchase new bottles more frequently.

525. Each Defendant could have unilaterally changed the container system it sold. FDA guidance specifically allows changing the number of units in a non-sterile drug under its Changes-Being Effected regulation. *See* FDA, *Guidance for Industry, Changes to an Approved NDA or ANDA, Revision 1*, at 21 (Apr. 2004), https://www.fda.gov/media/71846/download ("A change in the number of units (e.g., tablets, capsules) or labeled amount (e.g., grams, milliliters) of a

nonsterile drug product in a unit-of-use container."). FDA guidance also would treat changing to a unit-dose container such as a blister-pack to be a moderate change that could be implemented through the Changes-Being Effected regulation. *See id.* at 20–21 (only requiring pre-approval for *sterile* drug products, when moving *from* unit dose containers to multiple dose containers, rather than non-sterile drug products moving to unit dose containers).

526. A reasonably prudent manufacturer would have changed the containers for ranitidine-containing products to protect the products from humidity and reduce the time between manufacture and consumption, both of which would reduce the amount of NDMA produced.

527. Defendants' negligence was a substantial factor in causing Decedent's injuries.

528. Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Decedent, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to change the containers for their ranitidine-containing products. Defendants' reckless conduct therefore warrants an award of punitive damages.

529. As a direct and proximate result of Defendants' failure to use containers that minimize NDMA, Decedent has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

530. Plaintiff incorporates by reference each allegation set forth in paragraphs 516-29 as if fully stated herein.

531. Under Colorado law, a pharmaceutical manufacturer has a duty to exercise reasonable care in choosing and making the containers for its products.

532. Each Defendant breached this duty by failing to utilize containers that would

109

minimize the NDMA produced in its ranitidine-containing products.

533.    As a direct and proximate result of this failure, excessive levels of NDMA built up in the ranitidine-containing products each Defendant sold.  These high levels of NDMA caused Decedent's injuries.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT X:  NEGLIGENT STORAGE AND TRANSPORTATION
### (Against All Defendants)

534.    Plaintiff incorporates by reference each allegation set forth in paragraphs 20–29 (describing Defendants).

535.    The allegations in this Count apply to each Defendant during the time periods in which each was manufacturing ranitidine-containing products.  The relevant time periods are alleged in paragraphs 41–60 (for Defendants), which are incorporated by reference.

536.    Plaintiff incorporates by reference each allegation set forth in paragraphs 109–22 (describing the recall of ranitidine), 165–77 (describing the breakdown of ranitidine before ingestion), 185–88 (describing Defendant's knowledge), 189–210 (describing the regulatory framework for drug manufacturers), and 224–35 (describing Decedent's use of ranitidine and injury) as if fully stated herein.

537.    As alleged above, ranitidine degrades into NDMA more quickly at higher temperatures, at higher humidity levels, and under other poor storage or handling conditions.

538.    Defendants know of the need to maintain sensitive pharmaceutical drugs under proper shipping and storage conditions.  Defendants are aware and knew about the importance of precise temperature control down to the degree as well as the importance of precise humidity

control. More precise, colder transportation is, of course, more expensive than less precise, warmer transportation.

539.    The temperature and humidity specifications placed on Ranitidine-Containing Products also affect the stability of Ranitidine-Containing Products.

540.    Defendants know that Ranitidine is highly sensitive to humidity and moisture. Ranitidine that is subjected to humidity and/or moisture, degrades quickly and forms excessive amount of NDMA.

541.    Defendants must account for these heat and humidity conditions and specifications in order to set proper shipping, storage and handling policies as well as accurate retest and expiration dates.

542.    Testing of the quantity of NDMA in ranitidine performed has shown substantial variation among different batches.  Some ranitidine has much more NDMA when tested, and some has less.

543.    Defendants admit that substantial variation exists in NDMA levels in their ranitidine containing products, and that levels increase over time but more so when subjected to heat and humidity.

544.    Different ranitidine-containing products listed slightly different storage and transportation requirements, but a common label requirement was "store at 20°C to 25°C (68°F to 77°F)" and "avoid excessive heat or humidity."

545.    Defendants transport finished drug product from their facilities to distributor warehouses, as well as storing finished drug products in their facilities.

546.    Some Defendants also purchase API, which they store at their facilities.  Their agreements with API manufacturers govern how API is transported to them.  The storage and

transportation conditions of API is not dictated by the label for finished ranitidine-containing products, and may differ.

547.   Upon information and belief, Defendants systematically caused Ranitidine-Containing Products to be exposed to excessive levels of heat and/or humidity during manufacture, storage, shipping and handling that violated the instructions on the finished products' labels and caused ranitidine to degrade more quickly thereby increasing the levels of NDMA in the product.

548.   Based upon the documents produced by Defendants and based upon further information and belief, both the Defendants failed to ensure that their finished Ranitidine-Containing Products were stored and transported safely and were not exposed to excessive heat and humidity.

549.   Based upon the documents produced by Defendants and based upon further information and belief, both the Defendants failed to ensure that API they stored, transported, or over which they could control storage or transportation, were not exposed to excessive heat and humidity.

550.   Upon information and belief, Defendants failed to implement rigorous policies to ensure substantial compliance with the heat and/or humidity requirements on product labels.  This failure led to widespread noncompliance.

551.   For example, Defendants shipped ranitidine-containing products through the mail. This method of transportation—whether through the United States Postal Service or large common carriers such as FedEx and UPS—does not guarantee controlled temperature or humidity.  Because of Defendants' choice to allow this method of transportation, ranitidine-containing products shipped through the mail were systematically subject to excessive heat or humidity on days when the weather was hot or humid. In addition, Defendants failed to properly monitor temperature

112

and/or humidity levels during storage and transport.

552. Based upon the documents produced by Defendants and based upon further information and belief, both the Defendants failed to ensure that their Ranitidine-Containing Products (in both API and finished dose form) were stored and transported safely and were not exposed to excessive heat and humidity.

553. Defendants, directly or indirectly, transported, stored, handled, and/or sold ranitidine-containing products that Decedent used.

554. At all relevant times, Defendants had a duty to exercise reasonable care in the storage and transportation of ranitidine API and ranitidine-containing products to ensure the products were not unreasonably dangerous to consumers and users.

555. At all relevant times, Defendants knew or should have known of the need for storing and transporting finished Ranitidine-Containing Products within the labeled temperature range and at low humidity, and for storing and transporting ranitidine API at a reasonable, low temperature that would prevent degradation, and at low humidity.

556. Defendants ignored this risk. They did not ensure ranitidine API and Ranitidine-Containing Products were stored at low humidity or within the temperature range on the label. Instead, ranitidine API and Ranitidine-Containing Products were subjected to excessive humidity and/or heat during transportation and shipping which caused the drug to degrade leading to the formation of excessive levels of NDMA.

557. Ignoring the risks of degradation and NDMA forming was unreasonable and reckless.

558. Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to ranitidine-containing products.

113

559. Defendants' negligence was a substantial factor in causing Decedent's injuries.

560. As a direct and proximate result of Defendants' failure to store and transport ranitidine-containing products properly, Decedent has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

561. Plaintiff incorporates by reference each allegation set forth in paragraphs 534-60 as if fully stated herein.

562. Under Colorado law, a pharmaceutical manufacturer has a duty to exercise reasonable care in transporting and storing products.

563. Each Defendant breached this duty by failing to implement or enforce policies to ensure ranitidine-containing products and ranitidine API remained free from excessive heat and humidity.

564. As a direct and proximate result of these systematic failures, excessive levels of NDMA built up in the ranitidine-containing products each Defendant manufactured, stored, and transported.  These high levels of NDMA caused Decedent's injuries.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT XI:  UNJUST ENRICHMENT
### (Against All Defendants)

565. Plaintiff incorporates by reference the allegations set forth in paragraphs 1–244 as if fully stated herein.

114

566. At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold, or otherwise released ranitidine-containing products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, including Decedent.

567. Defendants knew that ranitidine-containing products posed a grave risk of harm but failed to warn of the dangerous risks associated with use and exposure to the products. The dangerous propensities of their products and the carcinogenic characteristics of NDMA were well known to Defendants.

568. Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading marketing, promotions, and advertisements that omitted disclosure that the products presented an unreasonable risk of substantial bodily injury resulting from their use.

569. Defendants requested and received a measurable benefit at the expense of Decedent in the form of payment for their ranitidine-containing products.

570. Defendants appreciated, recognized, and chose to accept the monetary benefits Decedent conferred onto Defendants at Decedent's detriment. These benefits were the expected result of Defendants acting in their pecuniary interests at the expense of Decedent.

571. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

572. Defendants wrongfully obfuscated the harm caused by their ranitidine-containing products. Thus, Decedent, who mistakenly enriched Defendants by relying on Defendants' misrepresentations of product safety, could not and did not know the effect that using ranitidine-

115

containing products would have on Decedent's health.

573. Plaintiff is entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiff to the position they occupied before dealing with Defendants. Due to their wrongful conduct and the FDA action recalling ranitidine-containing products in the form of a market withdrawal, Defendants are reasonably notified that Plaintiff would expect compensation from Defendants' unjust enrichment stemming from their wrongful actions.

574. Plaintiff incorporates by reference each allegation set forth in paragraphs 565-73 as if fully stated herein.

575. Under Colorado law, plaintiff may recover amounts by which defendants have been unjustly enriched.

576. As alleged above, each Defendant was unjustly enriched by selling ranitidine-containing products to Decedent, who did not know the products degraded into NDMA, a dangerous carcinogen.

577. Justice demands the repayment of Defendants' gain.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT XII: SURVIVAL ACTIONS
### (Against All Defendants)

578. As a direct and proximate result of the conduct of Defendants, Decedent, prior to her death, was obligated to spend various sums of money to treat her injuries, which debts have been assumed by her estate. As a direct and proximate cause of the aforesaid, Decedent was caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of her

116

death and, as a direct and proximate result of the aforesaid, Decedent suffered a loss of earnings and earning capacity. Plaintiff, as Administrator of the Estate of Decedent, beneficiaries and/or lawful representatives brings this claim on behalf of the estate for damages under any and all applicable statute or common law.

579. As a direct and proximate result of the conduct of Defendants, Decedent, and her spouse, until the time of Decedent's death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

580. As a direct and proximate result of the conduct of Defendants and including the observances of the suffering of the Decedent, until the date of her death, Plaintiff suffered permanent and ongoing psychological damage.

581. As a direct and proximate result of the aforesaid and including the observance of the suffering and physical deterioration of Decedent until the date of her death, Plaintiff has and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Plaintiff, as Administrator of the Estate of the Decedent, beneficiaries and/or lawful representatives bring the claims on behalf of the Estate for damages any and all applicable statutes or common law and in their own right.

582. Defendants' actions, as described above, were performed willfully, intentionally, and with reckless disregard for the rights of Decedent and the public.

583. As a result of Defendants' conduct, Decedent suffered the injuries and damages specified herein.

584. Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously and/or intentionally disregarded Decedent's rights so as to warrant

117

the imposition of punitive damages.

585.    Plaintiff incorporates by reference each allegation set forth in paragraphs 585-91 as if fully stated herein.

586.    Under Colorado law, the Estate of the Decedent alleged in this Complaint is entitled to damages for the harms inflicted upon the Decedent.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT XIII:  WRONGFUL DEATH
### (Against All Defendants)

587.    Decedent's spouse, beneficiaries, and/or lawful representatives of Decedent's Estate bring this claim on behalf of themselves and as the Decedent's lawful beneficiaries.

588.    As a direct and proximate result of the conduct of Defendants and the defective nature of ranitidine-containing products as outlined above, Decedent suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

589.    As a direct and proximate cause of the conduct of Defendants, Decedent's beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedent's deaths.

590.    Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

591.    Plaintiff incorporates by reference each allegation set forth in paragraphs 594-97 as

118

if fully stated herein.

592.   Under Colorado law, Plaintiff or the Estate of the Decedent alleged in this Complaint is entitled to damages for the harms inflicted upon the Decedent.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

593.   Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiff hereby demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in Plaintiff's favor and against Defendants for:

a.   actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.   exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

c.   pre-judgment and post-judgment interest;

d.   reasonable attorneys' fees as provided by law;

e.   costs and expenses of this action;

f.   statutory damages, treble damages and other relief permitted by law; and

g.   any other relief the Court may deem just and proper.

119

Respectfully submitted,


*/s/ John M. Masslon II*
John M. Masslon II (PA Bar #317058)
KELLER POSTMAN LLC
1101 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
Email: john.masslon@kellerpostman.com
Telephone: 202-968-0239
Facsimile: 312-971-3502

Dated: June 13, 2026                              *Counsel for Plaintiff*

120